IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1872.

## Spering's Appeal.

1. Directors in a stock corporation, as to the stockholders, are not technical trustees, but are as mandatories, and are bound to apply no more than ordinary skill and diligence.

2. Directors are not liable for mistakes of judgment, although so gross as to appear absurd, if honest and within the scope of their powers: especially where acting under direction of legal counsel.

3. Directors are responsible to the stockholders for losses from fraud, embezzlement, wilful misconduct, breach of trust: gross inattention or negligence, by which fraud has been perpetrated, by agents, officers or co-directors.

4. The responsibilities of directors in a stock corporation considered in this case.

January 10th and 11th 1872. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the decree at Nisi Prius: No. 3, to July Term 1867.

The bill in this case was filed April 13th 1867, by Joshua Spering, assignee of the National Safety Insurance and Trust Company, against James B. Smith, Samuel H. Ashton, C. Landreth Munns, Joseph B. Barry, F. Carroll Brewster, Edward L. Carter, Benjamin W. Jones, Henry L. Churchman, Francis Lee, Thomas B. Smiley, Stephen Coulter, Joseph Yerkes, Henry Diffenderfer, James L. Stevenson, William J. Reed, Peter Glasgow, Henry L. Benner, administrator, &c., of Henry L. Benner, deceased, and

(11)

Michael A. Byrne, administrator, &c., of Robert Selfridge, deceased.

The National Safety Insurance and Trust Company became insolvent in the winter of 1860–1861, and losses to a large amount were sustained by its depositors. They made an assignment for the benefit of creditors on the 18th of April 1861, to Henry L. Benner, Stephen Coulter and John Derbyshire. Spering, the plaintiff, was afterwards appointed trustee in their place. This bill was brought by the trustee to compel the directors and others, alleged to be connected with them, to make good the losses, on the ground of fraudulent mismanagement.

The bill set out: The National Safety Insurance and Trust Company was incorporated by Act of April 17th 1841, under the name of The Equitable and Life Insurance, Annuity and Trust Company, with the powers of the Philadelphia Fire, &c., Insurance Company, and were expressly restrained from exercising banking privileges.

The Philadelphia Insurance Company, by several Acts of Assembly, were empowered to make fire and marine insurance, to lend money on bottomry and respondentia, as the American Insurance Company, by their acts of incorporation, were authorized to do; and were to have also the privileges and be subject to the restrictions under a supplement of February 26th 1836, to the act incorporating The Pennsylvania Company for Insurance on Lives, &c; the capital to be $250,000, in 5000 shares of $50 each. By Act of April 1st 1842, there were given to The Equitable Insurance, &c., Company *all* the powers and privileges conferred on The Pennsylvania Company for Insurance on Lives, &c., by Act of March 10th 1812, and its supplements. These powers, &c., were to make insurance on lives, grant annuities, and make all kinds of contracts, involving casualties on lives and interest on money, to receive money in trust and pay interest not exceeding legal interest; the moneys to be invested in the debt of the United States or any municipal corporation of Pennsylvania, or in the stock of a bank, canal, bridge or road company, in groundrents or mortgages, or on any good and sufficient security or real estate taken in execution for debt.

On the 28th of May 1850, books were opened for subscription to the stock of the company; the 5000 shares were subscribed and directors were elected June 3d 1850; shortly afterwards the Court of Quarter Sessions of Philadelphia changed the name of the corporation to the "National Safety Insurance and Trust Company;" this change of name was afterwards confirmed by Act of Assembly. The company opened an office mainly for the purposes of a savings fund and also for life insurance; the risks of life insurance were in 1854 transferred to another company, the savings fund business being thereafter the main business of the company.

[Spering's Appeal.]

Directors were elected as follows:

William J. Reed, in the year 1850, annually until 1852.

| | | | | | |
|---|---|---|---|---|---|
| Peter Glasgow, | " | 1851, | " | " | 1854. |
| B. W. Jones, | " | 1852, | " | " | 1854. |
| J. B. Smith, | " | 1852, | " | " | 1857. |
| H. L. Churchman, | " | 1855, | " | " | 1857. |
| H. Diffenderfer, | " | 1858, | " | " | 1859. |
| H. L. Benner, S. K. Ashton, R. Selfridge, J. B. Barry, | " | 1850, | " | " | 1861. |
| F. C. Brewster, | " | 1851, | " | " | 1861. |
| E. L. Carter, | " | 1852, | " | " | 1861. |
| C. L. Munns, | " | 1853, | " | " | 1861. |
| F. Lee, | " | 1855, | " | " | 1861. |
| J. Yerkes, | " | 1858, | " | " | 1861. |
| J. L. Stevenson, | " | 1860, | " | " | 1861. |

H. L. Benner was elected president in 1851, and was continued until the assignment was made.

The company commenced the savings fund business, advertised extensively, and made statements in the pass-books of depositors, setting out the character of the investments, &c., and asserting the safety of the deposits, &c. The deposits in 1850 were $11,596.52, and with the exception of 1857 and 1858, annually increased until 1860, when they amounted to $1,313,819.21; in 1861 they amounted to $813,943.24.

That the defendants, instead of paying for their stock, gave notes, which lay over for a number of years, and some were never paid; they borrowed money on collaterals and took up the collaterals without paying the money borrowed; the expenses of the company were wasteful; many of the investments were of a character forbidden by law; those that were legal were made when there had been no profits; an over-valuation of assets was made, to show profits; the assets were sacrificed instead of enforcing payment of unpaid stock subscriptions; the account books were so confused, that the transactions of the company could not be ascertained.

Shortly after the original subscription of the stock, 750 shares of it were transferred to the company, and at the time of the assignment they held 964 shares; two assessments, together amounting to $10 per share, were made in 1850, to pay losses on life insurance. The most of these assessments were paid in notes of the stockholders, and dividends declared were applied to the payment of interest on these notes and to the principal; in December 1853, the amount unpaid on these assessments and the original subscriptions was $27,598.91; this balance was carried to account

of Bills Receivable, and the mode of final settlement the plaintiff could not ascertain. If the company had loaned at legal interest, the excess beyond 5 per cent. interest which was paid on deposits, would have been their profit, and their expenses should have been limited to that; this excess, from 1850 until the assignment, would have amounted to about $58,000, which was exceeded by the expenses and dividends. The directors discounted at usurious rates; at the date of the assignment, the assets were:

| | |
|---|---|
| Real estate, | $112,080 |
| Mortgages, | 46,634 |
| Ground-rents, | 47,159 |
| Stocks, | 470,433 |
| Bills receivable, | 217,415 |

Discounts and making loans were controlled by the finance committee, and were mostly nominally made to the defendant Coulter, commencing in 1853 and continuing till the assignment; the committee's books were contradictory; Coulter was in fact the agent of the company, he doing an usurious business for them, with their money, " without restraint or responsibility."

In 1852 until December the company held $900 of Coulter's liabilities; at that time they held $160,000; the amount of Coulter's notes varied, diminishing and increasing until November 1860, at which time a run commenced on the company; the notes were mainly Coulter's; when the assignees' inventory was filed none of his notes appeared; the transactions with him had at first been entered in the books as at legal rates of interest, and afterwards he made acknowledgments in writing of extra interest, of the amount of which there is no statement; fictitious entries or loose estimates were made in the accounts; large amounts of accumulated interest were carried to the credit of Bills Receivable, and Coulter gave his note for the amount. The business of the company was usurious at various rates, some as high as 3 per cent. per month. The real estate, ground-rents, mortgages, &c., were of doubtful value, some being collaterals to favor debtors; the value of assets was frequently increased on the books to show profits not earned; three-fourths of the investments were in bills receivable, although advertised to be in real estate and other solid securities; they invested also in forbidden securities, such as stocks in gas companies out of the state, real estate not taken in execution, &c. The insolvency arose, amongst other causes, from large expenses, unwarranted dividends, securities of a character which had to be sacrificed when a run was made on the company; there were false entries in their books for the purpose of deceiving, showing the assets greater and the liabilities less than in reality they were; loans were improperly made to directors, and whilst notes of defendants Ashton, Carter, Munns, Barry and Smith were unpaid, their collaterals were returned to them; their notes

were in "Bills Receivable," but not in the inventory. Early in 1861 depositors brought suit, judgments were recovered, executions compromised or stayed upon deposits of collaterals; real estate and other property were fraudulently transferred to Coulter; the assets at the assignment according to the books should have amounted to $896,711.65; some had been recovered by the plaintiff, but assets of value had been assigned by the directors between the run in 1860 and the assignment; the amount recovered by plaintiff was not sufficient to pay interest to the depositors; debtors of the company when sued had defended on the ground of the illegality of the debt; others would probably do the same; the defendant Reed held the office of secretary and treasurer of the company, and Smiley that of actuary, they were acquainted with its condition, and assisted the other officers in the fraud and mismanagement.

The prayers were for a decree against the defendants, to pay the plaintiff sufficient to make good the liabilities of the company, and for general relief.

By amendments to the bill the plaintiff charged that the defendants, during their respective terms of office, had entire control of the affairs of the company; that the frauds charged continued from 1854 until April 8th 1861; that each defendant participated in them, or by negligence permitted and encouraged them.

A decree was taken pro confesso against the seven defendants last named.

The appearing defendants filed demurrers interposing the statute of limitations; the demurrers were overruled as to all but Churchman and Smith. Judgment was entered for them on their demurrers; on Churchman's demurrer the following opinion was delivered by Thompson, C. J.:

"Directors in a corporation may in some sense be regarded as trustees for parties pecuniarily interested in its operations, but this results from the nature of the duties they are to perform. They are not technically trustees. An attorney in fact, bears a close resemblance to such a position, or perhaps an attorney at law is still nearer being an official representative. It is settled that, in these cases, the Statute of Limitations is applicable. Constructive trusts, it is well settled, are within the statute : 4 Barr 56 ; 2 Grant 273.

"The trust claimed to exist in this case, is of this nature in my opinion. Nine years after the demurrant, Churchman, had ceased to be in the direction of the National Safety Insurance and Trust Company, he is called upon by this bill, to answer an allegation of gross negligence in regard to the affairs of the company, during some period of his official incumbency as director. This I regard as the charge. The bill sets forth that he and the directors participated in frauds, or by the most gross and culpable negligence,

21 P. F. Smith—2

[Spering's Appeal.]

permitted and encouraged corrupt and negligent dealings with, and mismanagement of the moneys and assets of said company. The particulars of the fraud are not set out, and only the last branch of the alternative is sufficiently stated, if indeed either be. This negligence was a breach of duty, and might have made the party liable on the instant, or certainly when discovered. But if parties or the corporation, lie by nine years without evincing that they have been injured, the statute of repose in a common-law form would protect, and by assimilation, so in equity : 2 Daniels 43, 44.

"If nine years would not protect, nineteen would not. Had he continued a director, it is probable a different rule would be applicable. If no statute or lapse of time will protect a party once a director, nobody ought to serve as such. In addition, I see not any reason why the Act of 28th March 1867 should not apply in this case, although I do not place the case upon it. The demurrer to the bill by the defendant, Churchman, is sustained on the ground of the lapse of time alone, after he ceased to be a director and before bill filed."

Other defendants denied committing fraudulent or illegal acts ; averred that they always took collateral security with ample margin for loans ; publications were made by the executive officers not authorized by directors ; but the statements in them were believed to be true ; they all gave stock-notes but Lee, and most of them had been paid at the time of the assignment ; the collateral for money borrowed by them was changed only when excessive or the loans reduced; they had acted under legal advice ; the investments were not forbidden by law; dividends were not declared when there were no profits; the assets were not over-valued, but would have been much in excess of the liabilities, if it had not been for the pressure of the late war ; when the run commenced, just before the war, they believed it would be temporary, and under legal advice, they acted so as to preserve the existence of the institution when ordinary experience was at fault; if it had been possible to preserve the assets, the debts would have been paid; up to the time of the war the capital was sufficient without calling in all the instalments ; all the stock was subscribed, but some was forfeited to the company; there was no confusion in the accounts; usurious loans were not made ; the loans were under the control of the finance committee; Coulter was agent of the company ; defendants were not connected with him in any fraudulent transactions ; the assets had been committed to Coulter to sell to sustain the company in the crisis in 1860–1861 ; there were no fictitious entries in the books; nothing had been done to deceive depositors. Suits had been compromised under legal advice ; assets had been transferred to secure certain deposits; none of these defendants had possession of the assets; all the affairs of the company were laid before the stockholders.

[Spering's Appeal.]

They further averred, that the plaintiff had no cause of action; because, that was in the creditors alone; anything recovered would not enure to the corporation; the corporation had suffered no injury; if there had been a cause of action it would be barred by the Statute of Limitations. They denied the averments in the amendments.

F. C. Brewster pleaded the Statute of Limitations and that he had ceased to be a director in 1858. He also filed an answer in support of his plea. Replications were filed to the answers and pleas. George Bull, Esq., was appointed Examiner and Master.

The testimony taken was very voluminous, covering a vast amount of documentary evidence as well as oral testimony, presenting the affairs of the corporation, its assets from time to time, its management, &c.

The Master made a separate report in Judge Brewster's case; he sustained his plea of the statute upon the evidence and found also that he had ceased to be a director after 1858, and had not participated in the management of the corporation in any way after that time and was not liable.

In reporting as to the other defendants, the Master says: "It appears in the evidence that the defendants always acted upon legal advice, as to the mode of doing business, and making investments. No important step was taken without first obtaining the advice of the solicitor."

After an elaborate and thorough examination of the evidence and authorities, he reports his conclusions, viz:

"* * * Each act charged against defendants must stand by itself, and they are not 'continuing' or joined together so as to constitute one whole. Directors are not technical trustees cognisable only in equity. The primary condition of directors is that of agents or gratuitous mandatories of the corporation. * * * The plea of the statute will apply to each separate act, and all prior to six years will be barred unless there is fraud and concealment.

"There is no difficulty in determining the question of fraud and concealment. It appears by the facts reported, that there was no actual fraud whereby the defendants sought to obtain a personal advantage at the expense of the corporation. One fact is quite clear—that none of these defendants have ever made any profit out of their transactions which was not common to all the stockholders. * * * Their actions were governed by an honest desire to make money for the corporation. At each annual meeting of the stockholders, statements were laid before the meeting. * * * Among other items we find the 'accumulated interest,' set out as an asset. The valuations are all put down, so that any one might detect the fact if they were above the real value. In fact, all the information required to show the exact nature of their

business was there, and if the stockholders made no further inquiry, they can hardly allege concealment, and will be presumed to have assented. * * * The Master is clearly of the opinion that there is nothing like fraud and concealment. Consequently, in pursuance of the views above expressed, everything dating more than six years prior to the commencement of this suit will be barred. * * * This of course confines the whole case to a period of about three months prior to the date of assignment. * * *

"The final run upon the National Safety Insurance and Trust Company, which continued until the failure, commenced soon after the presidential election of 1860, and was caused by the great panic, which the apprehension of trouble in the South brought about. During the whole of that run no investments were made, except the purchase of the Winslow House. The whole attention of the officers was directed to efforts made to sustain the institution. There can be no question that the defendants who participated in that struggle, acted in good faith. They thought that the panic would soon pass away and that they would be able to weather the storm. The result showed that they were mistaken in this. But this was an error of judgment for which they cannot be held responsible. * * * They were bound to take the same care of the company's interests that a prudent man would of his own, and in doing this they were entitled to use the same discretion. If they believed that they could sustain the credit of the institution, and prevent its failure and the consequent loss, it was their duty to do so. That they did so believe is shown by the fact which is in evidence before the Master, that even at the very last, the defendants presented to the creditors a proposition in writing, whereby they agreed to become personally responsible for all the debts of the concern, if the creditors would agree to give them three years' time, the defendants in the meantime to have entire control of the assets. This proposition or agreement was signed by about one-half of the creditors. In making this offer they must have entertained confidence that the assets, by careful nursing, could be made to pay the debts of the institution. It will be remembered that some of the defendants were men of means, and their guaranty was of great value.

"The manner in which the defendants undertook to raise money at that time, is complained of. The company did not appear in the market as a borrower; to have done so would have hastened the catastrophe which they were trying to avert. Coulter was the agent and broker of the company, and in that capacity negotiated loans upon the collaterals. By this means the fact that the corporation was a borrower remained a secret. In some cases where it was deemed advisable, securities were sold, but most of them were hypothecated. The mode of transacting the business at that time was really an advantage to the corporation, because

[*Spering's Appeal.*]

it prevented the loss of credit, which would have resulted from a general knowledge in the market that the concern was negotiating loans to such an extent. * * *

"At the outset of this crisis, two alternatives were presented to these defendants; first, to make an assignment; second, to make a bold stand against the storm, and endeavor to save the institution. If they honestly believed that they would be able to save the company from destruction, it was their duty to accept the second alternative, and make the effort, and in doing this they were justified in making any reasonable sacrifice that the necessity of the case demanded. The latter course was the one pursued, and the mode in which they undertook to raise money was probably best for the institution. They might have gone into the market and sold their securities absolutely; instead of doing this, they resorted to a system of hypothecation, intending in this way to carry the company over the crisis, and afterwards redeem them. That this was by all odds the wisest course was proved by subsequent events. * * *

"The Master has been unable to find anything in the history of the company, during the time covered by this case, that can avail to render any of the defendants liable. If they were guilty of anything, it was too much anxiety to make money for the company, and to preserve its credit. The conclusion is that the plaintiff has no grounds for recovery, and his bill must therefore be dismissed with costs."

Exceptions were filed to the report. The court at Nisi Prius overruled the exceptions, and made a decree confirming the report.

From this decree and the decrees on the demurrers the plaintiff appealed to the Supreme Court in banc, and assigned the decrees for error.

*J. H. Gendell* and *E. S. Miller* (with whom was *C. B. Penrose*), for appellant.

*R. C. McMurtrie*, for Churchman, appellee.

*G. W. Biddle* (with whom was *J. Starr*), for Brewster, appellee

*G. Biddle* and *Z. P. Dobson*, for other appellees.

The opinion of the court was delivered, July 2d 1872, by

SHARSWOOD, J.—This bill was filed by the appellant as the assignee of the "National Safety Insurance and Trust Company," against the defendants, who were directors of the corporation, alleging fraudulent, illegal and improper management of its affairs, extending over a period of more than ten years, from 1850 to 1861. The case upon the bill, answers and proofs was referred to a Master, who reported that the bill should be dismissed and a *pro forma* decree was entered accordingly.

[Spering's Appeal.]

Upon a careful examination of the record and paper-books, which make up nine hundred and sixty-six printed octavo pages, we have come to the following conclusions of fact, which are supported also by the opinion of the Master. First, That no fraudulent conduct is imputable to any one of the defendants, at any period of time during their administration of the trust. No pecuniary advantage, to the amount of a dollar, was ever realized or sought by any one of them. There was no embezzlement or misappropriation of the funds by any officer or agent of the corporation. There is no pretence that the defendants are liable to account upon either of these grounds. "One fact," says the Master, "is quite clear—that none of the defendants have made any profit out of their transactions which was not common to all the stockholders." Second, That in regard to investments, and the mode of transacting the business—the legality of which under the charter is questioned—the defendants uniformly acted under legal advice. "It appears in the evidence," says the report, "that the defendants always acted upon legal advice, as to the mode of doing business and making investments. No important step was ever taken without first obtaining the advice of the solicitor." Third, Looking at the history of the institution in the light of subsequent events, its direction was unwise and unfortunate. The money of the depositors was not invested in first-rate and perfectly safe securities, as they engaged to do, and as the funds of such a charity unquestionably ought to be. Loans were largely made upon very doubtful collaterals. Their investments in real estate were injudicious. They lost from a failure to insure. They sought to realize large profits at usurious rates of interest. The crash came in 1860, just before the breaking out of the civil war. All doubtful securities fell in the market. Their debtors went to the wall. In the vain attempt to sustain their credit they sacrificed securities and collaterals. Had they stopped and made an assignment at once, a large amount of the loss which subsequently fell upon them would undoubtedly have been prevented. The story might be much amplified by entering into a detail of particulars: but the conclusion would be the same. Such is a brief resumé of the facts. It is not the history of this institution alone, but of many others in this country.

The broad question then is, whether upon such a state of facts, the directors of a corporation can be made to account for losses arising from mismanagement merely.

It is by no means a well-settled point what is the precise relation which directors sustain to stockholders. They are undoubtedly said in many authorities to be trustees, but that as I apprehend is only in a general sense, as we term an agent or any bailee intrusted with the care and management of the property of another. It is certain that they are not technical trustees. They can only

be regarded as mandataries—persons who have gratuitously undertaken to perform certain duties, and who are therefore bound to apply ordinary skill and diligence, but no more. Indeed, as the directors are themselves stockholders, interested as well as all others that the affairs and business of the corporation should be successful, when we ascertain and determine that they have not sought to make any profit not common to all the stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill. Ought they to be held responsible for mistakes of judgment or want of skill and knowledge ? They have been requested by their co-stockholders to take their positions, and they have given their services without compensation. We are dealing now with their · responsibility to stockholders, not to outside parties—creditors and depositors. It is unnecessary to consider what the rule may be as to them. Upon a close examination of all the reported cases, although there are many *dicta* not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, or where such fraud might have been prevented had they given ordinary attention to their duties. I do not mean to say by any means that their responsibility is limited to these cases, and that there might not exist such ·a case of negligence or of acts clearly *ultra vires*, as would make perfectly honest directors personally liable. But it is evident that gentlemen elected by the stockholders from their own body ought not to be judged by the same strict standard as the agent or trustee of a private estate. Were such a rule applied, no gentlemen of character and responsibility would be found willing to accept such places. The authorities I think fully endorse these views.

The leading case is The Charitable Corporation *v.* Sutton, 2 Atk. 400, which was treated by Lord Hardwicke as a case of fraud entirely. Five of the managers or committee-men entered into a confederacy to loan out money to their own storekeeper, upon whom was devolved the duty of putting an estimate upon the value of the pledges; the others connived at the fraud. "It is such a notorious fraud or at least gross inattention," said the Lord Chancellor, "to suffer him, who was to set a value on all the pledges, to borrow money upon them himself, that I shall direct those who appear to be guilty of it to make good the loss. Committee-men are most properly agents to those who employ them in the trust and who empower them to direct and superintend the affairs of the corporation. If some persons are guilty of gross non-attendance and leave the management entirely to others, they may be guilty by this means of the breaches of trust that are committed by others." So accordingly ·in The York & North

Midland Railway Company *v.* Hudson, 16 Beavan 495, the chairman of a railway company appropriated unallotted shares to the use of various persons, whose names he did not mention, in order to secure or reward services which he declined to state, but which it was insinuated was in the nature of "secret service money;" it was held that if the defendant had applied the property of the company in a manner which would not bear the light, he must suffer the consequences, and that being charged with the receipt of the money, he could not discharge himself by the suggestion of such an application. In Williams *v.* Page, 24 Beavan 661, Sir John Romilly said, in treating a director as a trustee: "The trust no doubt is a peculiar one." In Great Luxembourg Railway Co. *v.* Magnay, 25 Beavan 592, he held that if a director enters into a contract for the company he cannot personally derive any benefit from it. So also in Ex parte Bennett, 18 Beavan 339, directors of a public company are trustees for the shareholders, and their private interests must yield to their public duty wherever they are conflicting. In Turquard *v.* Marshall, 3 Equity (Law Rep.) 127, which is the last English case on the subject, Lord Romilly, M. R., held directors liable, first, for not calling a meeting of the shareholders under a clause of the charter requiring them to do so, on the exhaustion of their surplus fund, and second, for loaning money to one of themselves without security. He used however this language: that if directors have been guilty of gross and palpable breach of trust, which cannot be set right by a public meeting of the company, they may be made responsible for their misconduct. On appeal, however, the decree of Lord Romilly, holding the directors personally liable, was reversed by Lord Chancellor Hatherley, 5 Chancery Appeals (Law Rep.) 386. He said: "There was no fraud alleged, nor was it alleged that the directors applied the funds of the company to their own use, or in any way except in what they thought was for the benefit of the company, however incorrect their course might have been." Then as to the loan to Higgins (the co-director): "The statement of this in the bill was only as part of the general misconduct of the directors, and the loan was only mentioned as one of the losses incurred. There was no specific allegation of any impropriety in lending the money to him, nor was any specific relief prayed in this respect. It was within the powers of the deed to lend to a brother director, and however foolish the loan might have been, so long as it was within the powers of the directors, the court could not interfere and make them liable. They were intrusted with full powers of lending the money, and it was part of the business of the concern to trust people with money, and their trusting to an undue extent was not a matter with which they could be fixed, unless there was something more alleged, as, for instance, that it was done fraudulently and improperly and not merely by a default

[Spering's Appeal.]

of judgment. Whatever may have been the amount lent to anybody, however ridiculous and absurd their conduct might seem, it was the misfortune of the company that they chose such unwise directors; but as long as they kept within the powers of their deed, the court could not interfere with the discretion exercised by them."

To pass now from the English to the American cases: Koehler v. The Black River Falls Iron Co., 2 Black S. C. 715, was a case of fraud. Mr. Justice Davis said: "Instead of honestly endeavoring to effect a loan of money advantageously for the benefit of the corporation, these directors, in violation of their duty and in betrayal of their trust, secured their own debts to the injury of the stockholders and creditors. Directors cannot thus deal with the important interests intrusted to their management. They hold a place of trust, and by accepting the trust are obliged to execute it with fidelity, not for their own benefit, but for the common benefit of the stockholders of the corporation." In Scott v. Depeyster, 1 Edw. Ch. Rep. 513, the object of the bill was to make the directors liable for money embezzled by their secretary on the ground of their negligence. So, Robinson v. Smith, 3 Paige 222, the bill alleged that the directors had engaged in a gambling speculation in stocks, wholly unauthorized by the charter, which was carried on to subserve their own individual interests and purposes. On demurrer to the bill, it was of course held that the directors of a corporation, who wilfully abuse their trust or misapply the funds of the company by which a loss is sustained, are personally liable as trustees to make good that loss, and they are also liable if they suffer the corporate funds to be lost or wasted by gross negligence and inattention to the duties of their trust. In the same category is Taylor v. Miami Exporting Company, 5 Hammond (Ohio) 162; Verplanck v. Mercantile Insurance Co., 1 Edw. Ch. Rep. 84; Bank of St. Mary v. St. John, 25 Alab. N. S. 566; Butts v. Wood, 38 Barb. 181; s. c. 37 New York 317. In The Franklin Fire Insurance Co. v. Jenkins, 3 Wend. 130, which was an action on the case in which the declaration alleged against directors " want of care and attention," and also " corrupt and wilful mismanagment," a demurrer was sustained Sutherland, J., remarking: " These are very different allegations and require distinct and different answers." Lexington & Ohio Railroad Co. v. Bridge, 7 B. Monroe 556, was a bill by creditors against directors for making a dividend when no profits existed. " We are satisfied," say the court, " that if they were guilty of negligence to any extent it is not of that gross and palpable character that would render their conduct so reprehensible as to subject them to the imputation of a personal or even a legal fraud." In Godbold v. Branch Bank at Mobile, 11 Alab. 191, it was decided that the directors of a bank are not responsible for

an injury to the bank caused by their act, originating in an error of judgment, unless the act be so grossly wrong as to warrant the imputation of fraud or the want of the necessary knowledge for the performance of the duty assumed by them on accepting the agency. In Hodges *v.* New England Screw Company, 1 Rhode Island 312, in dismissing the bill, Greene, C. J., observed: " It does not appear that the directors sought or secured to themselves any benefit or advantages which was not common to all the other stockholders of the Screw Company." See also Neall *v.* Hill, 16 California 145.

It seems unnecessary to pursue this investigation any further. These citations, which might be multiplied, establish, as it seems to me, that while directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or wilful misconduct or breach of trust for their own benefit and not for the benefit of the stockholders, for gross inattention and negligence by which such fraud or misconduct has been perpetrated by agents, officers or co-directors, yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest and provided they are fairly within the scope of the powers and discretion confided to the managing body.

In regard to the question last adverted to, whether the defendants should be held responsible for any of their acts and investments as *ultra vires*, it might be sufficient to notice the fact that the charter of this corporation was a very complicated one, made up by comparing together no less than sixteen different acts of incorporation or supplements. The ingenuity of the young gentlemen of counsel for the defendants has been exercised in presenting to the court a genealogical map or pedigree, tracing the Acts of Assembly, from one to another. To have mistaken the extent of their powers under such circumstances would not have been matter of surprise even in the most timid and cautious. We may adopt upon this point the language of C. J. Greene in Hodges *v.* New England Screw Co., 1 Rhode Island 312. " In considering the question of the personal responsibility of the directors we shall assume that they violated the charter of the Screw Company. The question then will be, was such violation the result of mistake as to their powers, and if so did they fall into the mistake from want of proper care, such care as a man of ordinary prudence practises in his own affairs. For, if the mistake be such as with proper care might have been avoided, they ought to be liable. If, on the other hand, the mistake be such as the directors might well make, notwithstanding the exercise of proper care, and if they acted in good faith and for the benefit of the Screw Company, they ought not to be liable." We may say in this case, conceding that the directors did violate the charter, it was a ques-

[Spering's Appeal.]

tion upon which with all due care they might have made an honest mistake ; and moreover, it appears by the evidence, and is so reported, that they acted throughout by the advice of their counsel. It is well settled that trustees will be protected from responsibility under such circumstances: Lewin on Trusts 595; Vez *v.* Emery, 5 Ves. 141 ; Calhoun's Estate, 6 Watts 189.

The view which we have thus taken of the facts and the principles of law applicable to them, renders it unnecessary to consider whether there is anything in the case of the defendant Brewster to distinguish his liability from that of the others. It also dispenses with the necessity of discussing the operation of the bar of the Statute of Limitations, except in the cases of the defendants Churchman and Smith, who having raised their defence by demurrer the bill was separately dismissed as to them. Upon the point as made in their case, each of them having entirely ceased to be a director, more than six years before the bill was originally filed, we entirely concur in the opinion of the Chief Justice in Churchman's case.

Decree affirmed, and appeal dismissed at the costs of the estate in the hands of the appellants.