Swentzel *v.* Penn Bank.   Warner's Appeal.   Hutchinson's Appeal.

[Marked to be reported.]

*Bank directors—Liability—Banks and banking.*

Bank directors being gratuitous mandatories, are only liable for fraud, or for such gross negligence as amounts to fraud. If they use the ordinary care which bank directors usually exercise, they will not be liable for misappropriations by the officers of the bank.

*Ordinary care—Gross negligence.*

In regard to what is ordinary care, regard must be had to the usages of the particular business. If a bank director performed his duties, as such, in the same manner as they were performed by all other directors of all other banks in the same city, it cannot be fairly said that he was guilty of gross negligence.

*Presumption as to ordinary care.*

Where bank directors have not sought to make any profit not common to all the stockholders, there is a strong presumption that they have brought to the administration of the affairs of the bank, their best judgment and skill.

*Circumstances showing ordinary care.*

The president of a bank, aided by the cashier and some of the clerks made false entries in the individual ledger, in order to conceal misappropriations of the bank's funds. By the rules of the bank and of a large majority of the banks of the same city, the directors were not allowed to see the individual ledger. The other books, all of which were accessible to the directors, were correctly kept. Statements submitted to the directors from time to time, contained nothing to arouse their suspicions. After the suspension of the bank the directors raised a large sum of money on their individual credit to enable the bank to resume. *Held*, that under such circumstances, they should not be held liable for the fraud of the other officers.

*Withdrawal of deposit by director—Partnership.*

Where a director acting upon information obtained in his confidential relation with the bank withdraws on the day of the suspension of the bank the deposit of a partnership of which he is a member, he will be ordered to repay it.

*Costs in equity—Discretion of court.*

Under the circumstances of this case, the defendants having vindicated themselves from the charges made against them, the Supreme Court will relieve them from the costs imposed upon them by the court below, although the imposition of the costs was within the sound discretion of the lower court.

Argued Nov. 10, 1891.  Appeals, Nos. 289, 295, Oct. T., 1891, by Henry Warner, assignee, A. A. Hutchinson and Thomas Hare, from a decree of C. P. No. 2 of Allegheny Co., July T., 1884, Nos. 304 and 380, on a bill in equity.  Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS and MITCHELL, JJ.

E. W. Swentzel, Elias J. Unger and other creditors of the Penn Bank filed two bills in equity against the Penn Bank and Henry Warner, its assignee, W. N. Riddle, president, and Geo. B. Gordon, his assignee ; F. B. Laughlin, vice-president; G. L. Reiber, cashier; James Herdman, James H. Hopkins, D. W. C. Carroll, T. Brent Swearingen, Samuel Severance, Philip Reymer, Thomas Hare, George C. Davis, Frank Rahm, A. W. Cavitt, A. A. Hutchinson and J. O. Brown, directors of the bank.

The bill averred that the Penn Bank incorporated to do a banking and insurance business, began a general banking business in the city of Pittsburgh in 1873, and continued said business until May 21, 1884, when it suspended payment ; that for more than one year prior to May 21, 1884, the bank had been insolvent, which fact was known to, or ought to have been known to its officers and directors ; that the officers and directors of the bank for several years before the suspension published statements showing that the bank was solvent and prosperous, but that such statements were false ; that the directors of the bank carelessly and negligently permitted the president, cashier and some of the directors to use the funds of the bank in the illegitimate and hazardous business of gambling in oil ; that within two years before the suspension of the bank its officers and directors permitted a large portion of the funds and moneys thereof, to be checked out and withdrawn in the names of fictitious persons and firms ; that, after the suspension of the bank on May 21, 1884, the defendants caused false statements to be published concerning its condition, which statements the complainants relied upon, and increased their deposits, but that the bank was then utterly insolvent, and that it finally suspended payment on May 26, 1884 ; that after it was ascertained that the bank must finally suspend payment, the defendants permitted some of the directors to take and apply to their own use large sums of money then in the bank.

The bill prayed that the officers and directors be decreed to pay to the complainants all moneys lost by reason of the defendants' carelessness, negligence and fraudulent management; that it be decreed that J. O. Brown, Samuel Severance, Thomas Hare, A. A. Hutchinson and Philip Reymer pay complainants and other creditors all moneys which they drew out of said bank between May 21, 1884, and the date of the assignment to Henry Warner.

The directors filed answers denying the material averments of the bill.

The case was referred to H. Hice, Esq., as master, who found among other things, the following facts: In 1874, W. N. Riddle was elected secretary and treasurer of the Penn Bank. In 1882, he was elected president, and was re-elected at the annual election in March 1883 and 1884, and served as president until the bank suspended. Prior to May 21, 1884, the bank was apparently prosperous. Nothing seems to have occurred, or been noticed by the directors, in the business, or its transactions by the president, cashier or other employees, or in their conduct that caused any question or aroused any suspicion in their minds as to the honesty and faithfulness of those officers, or that the bank was other than solvent and prosperous, when on May 21, 1884, the doors of the bank were closed and payment suspended by Riddle, the president, without the knowledge and authority of the board of directors or any of them. Riddle stated to the directors that there had been an unusual amount of checking out of funds by depositors, and that he could not convert the securities of the bank into cash fast enough to meet the demands; that the bank however had plenty of resources, and the only need was ready money until securities could be converted. The directors then, on their individual credit, raised $289,000, and the bank reopened on May 23, 1884, and remained open until May 26, 1884, when it finally closed its doors. A thorough examination was then made of the books and affairs of the bank, and it appeared that in 1883, the president began to misappropriate the funds of the bank for the purpose of carrying on gambling speculations in oil. The money abstracted from the bank for this purpose, was from time to time, charged on the individual ledger of the bank against persons and firms, and principally against fictitious persons and firms,

as overdrafts. The president in combination with the cashier, kept these transactions from the knowledge of the directors, and, on May 19, 1884, submitted a statement to the board, which on its face showed that the bank was in good condition.

The directors did not examine the individual ledger. On this subject the master reported as follows:

"These directors did not examine the individual ledger. Their knowledge of the condition of the bank was derived from the weekly statements required to be furnished them by the officers and the semi-annual auditings and the general information acquired from the officers. As bearing on the question whether they were negligent in this respect and whether they should not have examined the accounts in the individual ledger much testimony was taken to show the course of action of the directors in other banks in the city. Amongst others the following were examined: [Naming a large number of bank officers of the city of Pittsburgh.] These witnesses concur in stating that the form of statement furnished weekly by the Penn Bank officers to the board was substantially the same as the statements used and furnished in their respective banks, many of them stating they were more in detail. In some four or five of them spaces were provided in the statements for overdrafts, and in one or two this has been added since the failure of the Penn Bank. In two or three the auditing committee ascertain the overdrafts. The general course in these banks was for the officers to look after the overdrafts, and with the exception of two or three of the banks represented, it was not the practice for the directors to examine the accounts in the individual ledger, nor at the audits."

The master further found that the directors had no knowledge of the fraudulent misappropriation of the funds of the bank. It also appeared from the testimony, that James H. Hopkins was absent from the city at the time of the suspension, and during most of the time of the irregularities in the management of the bank; that Frank Rahm was not a director at the time; and that James Herdman and Philip Reymer were in infirm health, and unable to attend to business. On May 26, 1884, after the bank had failed, the directors, Brown, Severance, Hare, Hutchinson and Reymer, withdrew their deposits. Some of these amounts were, however, subsequently paid over to the assignee.

The master recommended a decree against Riddle and Reymer, and that the bill should be dismissed as to the other defendants.

The assignee filed, inter alia, the following exceptions:

4. The master errs in failing to find that the defendants, the directors of the bank, by gross negligence in the management of its affairs made possible and invited the improper use of funds which resulted in the great loss to the bank.

5. The master errs in not finding that the directors of said bank were grossly negligent in that they did not take the ordinary precaution against excessive overdrafts and thus enabled the president of the bank to abstract its funds without detection.

6. The master errs in not finding and reporting that the defendants, directors of the Penn Bank, were guilty of gross negligence of the management of the affairs of said bank, and that by reason of such negligence the bank lost at least one million dollars, and that said defendants, Thomas Hare, James H. Hopkins, James Herdman, F. B. Laughlin, Samuel Severance, Philip Reymer, A. A. Hutchinson, Frank Rham, T. Brent Swearingen, A. M. Cavit, D. W. C. Carroll, George C. Davis and J. O. Brown are liable to Henry Warner, assignee, for said sum.

7. The master errs in recommending that the bill be dismissed as to the defendants, Laughlin, Herdman, Hopkins, Carroll, Swearingen, Severance, Reymer, Hare, Davis, Rahm and Cavitt.

8. The master errs in not finding and reporting the amount for which the defendants, W. N. Riddle and G. L. Reiber are liable to plaintiff.

9. The master errs in finding that Thomas Hare and Samuel Severance paid to the assignee the money improperly withdrawn by them from the bank on the 26th day of May, 1884, and in not finding that said Hare and Severance expressly admitted that they *did not* pay said money nor any part of it to said assignee, and in not finding and reporting that Thomas Hare is liable on said account for $3,716.23, with interest from May 26, 1884, to the date of the decree, and Samuel Severance is liable for $554.54, with interest from May 26, 1884, to the date of the decree.

The court overruled the fourth, fifth, sixth and seventh exceptions and sustained the eighth and ninth exceptions, and entered the following decree :

That G. L. Reiber is liable and shall pay to Henry Warner, assignee of the Penn Bank, $500,000.

That William N. Riddle is liable to the said Henry Warner, assignee, for the sum of $1,200,000, and it is adjudged and decreed that he is liable and shall pay to Henry Warner, assignee of the Penn Bank said sum of $1,200,000.

That Thomas Hare is liable and indebted and shall pay to the said assignee the sum of $3,716.23, with interest thereon from May 26, 1884, less five and seven eighths per cent of the principal sum, said deduction being the amount of the dividend paid by the assignee to creditors upon the distribution heretofore made by said assignee.

That Samuel Severance is liable and indebted and shall pay to Henry Warner, assignee of the Penn Bank, $554.54, with interest thereon from May 26, 1884, less the dividend of five and seven eighths per cent on principal sum, being the dividend heretofore paid by the assignee to the creditors of the Penn Bank.

It is further ordered and decreed that the defendants, W. N. Riddle, F. B. Laughlin, G. L. Reiber, James Herdman, James H. Hopkins, D. W. C. Carroll, T. Brent Swearingen, Samuel Severance, Philip Reymer, Thomas Hare, George C. Davis, Frank Rahm, A. M. Cavitt, A. A. Hutchinson and J. O. Brown, shall pay the costs of suit in these cases, including the master's fee of $2,500.

That, except as to the matters above specified, the master's report is hereby confirmed, and on payment of the costs and master's fee as above stated, the bill is dismissed as to A. A. Hutchinson, James Herdman, Philip Reymer, J. O. Brown, T. Brent Swearingen, F. B. Laughlin, A. M. Cavitt, George C. Davis, James H. Hopkins, D. W. C. Carroll.

*Errors assigned* by Henry Warner, assignee, were (1–4) the dismissal of the assignee's 4th, 5th, 6th and 7th exceptions, quoting them respectively; (5) in the application of the law to the facts as found in the opinion upon the exceptions to the master's report, in that said facts warrant the conclusion that the directors, defendants, were guilty of such negligence in the

management of the Penn Bank as to render them personally liable for its losses ; (6) in the legal conclusion from the facts found that the defendants, directors, are not liable for the percentage of loss, occasioned by the negligent reopening of the bank; (7) in not finding and entering a decree that the defendants, directors, were liable to and should pay the creditors for their percentage of loss occasioned by the reopening of the bank, and that they were so liable to, and should pay the amount of $225,000 ; (8) in decreeing that the bill should be dismissed as to the directors; (10) in not decreeing that the directors should pay the losses to the bank, ascertained by the court to be $1,200,000 ; (11) in finding the defendants, James H. Hopkins, on account of absence on public business ; James Herdman, on account of infirm health; Frank Rahm, on account of not being a director at the time; and Philip Reymer, on account of infirm health, and, probably, unable to attend to the business, were relieved.

*H. A. Miller, D. F. Paterson* and *A. M. Brown,* for Henry Warner, assignee.—By accepting their office bank directors are obliged and required to execute it with fidelity and reasonable diligence : Charitable Corporation v. Sutton, 2 Atk. 400 ; Percy v. Millaudon, 8 Martin N. S. (La.) 68.   They must use the same care that they exercise over their own business : Hun v. Cary, 82 N. Y. 65, 71; Williams v. McKay, 40 N. J. Eq. 189.

Briggs v. Spaulding, 141 U. S. 132, relied upon by the court below, was essentially different in its facts.   In the first place it was a national bank, and under the act of Congress, the power to conduct its business was expressly entrusted to its officers, and the directors did not violate any law in permitting the president to conduct its business.   In the second place the losses occurred at a time when most of the defendants were either not directors or incapacitated from attending to business.

The abstractions of money continued for so long a time and were so large that the appellees should have known it.   Under the ruling in Williams v. McKay, 40 N. J. Eq. 189, there was a prima facie case against the directors.

The directors knew of over drafts, and this was sufficient to put them upon notice of the condition of the bank.

The directors were negligent in permitting Riddle, the

president, to manage all the affairs of the bank and to engage in oil gambling operations. They were also negligent in re-opening the bank.

 *S. Schoyer, Jr.,* and *D. T. Watson,* with them *J. M. Stoner, Geo. W. Guthrie, Isaac S. Van Voorhis, T. C. Lazear* and *Knox & Reed,* for A. A. Hutchinson and the other directors. The report of a master when confirmed by the court is conclusive unless the testimony clearly shows a plain mistake. Harland's Accounts, 5 Rawle, 323; Ludlam's Est., 13 Pa. 188; Gossner's Est., 6 Wharton, 403; Bicking's Ap., 2 Brewster, 230.

The question of the defendant's negligence is res adjudicata : Warner's Ap., 2 Cent. Rep. 44.

The directors were not bound to the same care as trustees. The relation between a bank and its depositors is not that of trustee and cestui que trust, but that of debtor and creditor. Bank v. Millard, 10 Wall. 155 ; Bank of Northern Liberties v. Jones, 42 Pa. 536 ; Morse on Banks and Banking, p. 26. The directors of a bank being gratuitous mandatories are liable only for fraud or such gross negligence as amounts to fraud : Maisch v. Savings Fund, 5 Phila. 30; Spering's Ap., 71 Pa. 21 ; Movius v. Lee, 30 Fed. Rep. 307 ; Briggs v. Spaulding, 141 U. S. 132; Preston v. Prather, 137 U. S. 604; Percy v. Millaudon, 8 Mart. (La.) N. S. 68 ; Wallace v. Lincoln Savings Bank, 9 Ry. and Corporation Law Journal, 482 ; the English cases establish the same principle : Land Credit Company v. Fermoy, L. R. 5 Ch. App. 763; In re Dean Coal Mining Co., 10 Ch. Div. 450 ; Faure Electric Co., 40 Ch. Div. 141; Flitcroft's Case, 21 Ch. Div. 519; Perry's Case, 34 L. T. 716; Denham & Company, 25 Ch. Div. 752 ; Jackson v. Munster Bank, 15 L. R. 356.

No case can be found were an attempt was successfully made to charge the directors with a loss happening from the fraud and embezzlement by the president or cashier of the bank or codirector, except where gross negligence was shown on the part of the directors. Spering's Ap., 71 Pa. 21; Watt's Ap., 78 Pa. 392; Maisch v. Saving Fund, 5 Phila. 30 ; Adams v. Manning, 10 W. N. C. 450 ; Addams' Ap. (S. C.), 15 W. N. C. 230; Movius v. Lee, 30 Fed. Rep. 298; Scott v. Depeyster, 1

Ed. Ch. 513; Angell & Ames on Corporations, 10 ed., p. 314; Dunn's Adms. v. Kyle's Adms., 14 Bush. 134; Vance v. Ins. Co., 4 Lea (T.) 385; Henry v. Jackson, 37 Vt. 431; Perry's Case, 34 Law Times, 716; Bank v. Baird, 11 Sessions Cases (3d series) 112; In re Denham & Co., 5. Am. & Eng. Corp. Cases, 260; Robinson v. Smith, 3 Paige, 222; Loan Assn. v. Coriell, 34 N. J. Eq. 383; Neall v. Hill, 16 Cal. 151; Shearman & Redfield on Negligence, 589; Savings Bank of Louisville's Assignee v. Caperton et. al., Ky. Court of Ap., Jan. Term, 1888; Thompson on Liability of Officers and Agents, 359.

A bank director is not liable to a depositor, there being no relation or privity between them. Ackerman v. Halsey, 37 New Jersey Equity, 362; Smith v. Hurd, 12 Metc. (Mass.) 371; Hodges v. N. E. Screw Co., 1 R. I. 312; Craig v. Gregg, 83 Pa. 20; Maisch v. Saving Fund, 5 Philada. 32; Robinson v. Smith, 3 Page, 233; Heath v. Erie Ry. Co., 8 Blatch. 374; Abbott v. Merriam, 8 Cush. 590; Peabody v. Flint, 6 Allen, 56; Hersey v. Veazie, 24 Me. 12; Williams v. Halliard, 38 New Jersey Equity, 376.

*T. C. Lazear*, with him *Orr*, for Thomas Hare.—The act of Thomas Hare not having been done by him in his official capacity as a director, he had the same right to check out the money as any other depositor: 2 Morawetz on Corporations; Catlin v. Eagle Bank, 6 Conn. 233; Buell v. Buckingham, 16 Iowa, 284; Smith v. Skeary, 47 Conn. 47; Railroad Co. v. Claghorn, 1 Spears' Eq. Rep. 545; Beach v. Miller, 23 Ill. Ap. 151; Field on Corporations, sec. 177.

The money was not the individual money of Hare, but of the firm to which he belonged, and it has a right to retain it.

OPINION BY MR. JUSTICE PAXSON, January 4, 1892.

This case has been so carefully considered by the learned master and court below, that little remains for us to add. Indeed, in a case of such magnitude, involving a vast mass of testimony, we can do little more than see that the principles upon which it has been decided below are sound.

Briefly stated, the bill was filed for the purpose of holding the officers and directors of the bank responsible for the losses resulting from its failure. It is claimed that the officers and directors were negligent in their management of the bank's

affairs, and that by reason of such negligence the losses oc-
curred.

It is conceded on all sides that the losses and the disastrous
failure of the bank were directly traceable to Mr. Riddle, its
late president, now deceased.    He practically emptied the
vaults of the bank in carrying on a gigantic speculation in oil.
This was done with the knowledge of the cashier, and the co-
operation of one or more clerks or subordinates.    It would
have been extremely difficult, if not practically impossible, for
any person to have committed such a swindle without the co-
operation of some one inside.    The question is whether the
directors ought to have known of these transactions, and
whether their failure to know what the real plunderer was do-
ing, was such negligence on their part as to render them liable
to the creditors of the bank.

The Penn Bank closed its doors in May, 1884.    It is not
too much to say that its failure was a great shock to the busi-
ness interests of Pittsburgh.    It was the cause of much excite-
ment; led to a large amount of litigation, much of it directed
against the board of directors.    As usual, in such cases, the
current of public opinion was turned against them, and up to
the present time they have been defending themselves against
hostile litigation.    The time has now arrived when the rights
of the parties can be considered calmly, and disposed of in dis-
regard of prejudice or popular clamor.

The first question that naturally suggests itself for our con-
sideration is, the extent of the duty which the directors of a
bank owe to the stockholders, whom they represent directly,
and the creditors, whom they represent indirectly.

Upon this point there is a general misapprehension in the
popular mind.    This finds expression, after bank failures, in
severe condemnation of directors, and a general assertion of
the doctrine that their duty requires them to be familiar with
all the details of the management.    In the popular mind they are
held to the rule that they ought to take the same care of the
affairs of the bank that they do of their own private business.
Even the learned judge below evidently adopted this view,
when he said in his opinion : "If we were to decide this case
on first impressions, as to the conclusions of fact to be drawn,
and under the decisions cited and rules laid down in the minor-

ity opinion in Briggs v. Spalding, we would say there was gross negligence, or want of the ordinary care that a man of fair intelligence would take of his own affairs."

It cannot be the rule that the director of a bank is to be held to the same ordinary care that he takes of his own affairs. He receives no compensation for his services. He is a gratuitous mandatory. His principal business at the bank is to assist in discounting paper, and for that purpose he attends at the bank at stated periods—generally once or twice a week— for an hour or two. The condition of the bank is then laid before him, in order that he may know how much money there is to loan. Once or twice a year there is an examination of the condition of the bank, in which he participates. The cash on hand is counted, the bills receivable and sureties examined, to see whether they correspond with the statement as furnished by the officers. Beyond this he has little to do with either the cash or the books of the bank. They are in the care of salaried officials who are paid for such services, and selected by reason of their supposed integrity and fitness. To expect a director, under such circumstances, to give the affairs of the bank the same care that he takes of his own business, is unreasonable, and few responsible men would be willing to serve upon such terms. In the case of a city bank, doing a large business, he would be obliged to abandon his own affairs entirely. A business man generally understands the details of his own business, but a bank director cannot grasp the details of a large bank without devoting all his time to it, to the utter neglect of his own affairs.

A vast amount of authority has been cited upon this question, which we do not think it necessary to review. It is sufficient to refer to a few cases only. In Spering's Ap., 71 Pa. 11, the subject is very fully discussed by the late Justice SHARSWOOD, and the rule of ordinary care is laid down. Not, however, the ordinary care which a man takes of his own business, but the ordinary care of a bank director in the business of a bank. Negligence is the want of care according to the circumstances, and the circumstances are everything in considering this question. The ordinary care of a business man in his own affairs means one thing; the ordinary care of a gratuitous mandatory is quite another matter. The one implies an over-

sight and knowledge of every detail of his business; the other suggests such care only as a man can give in a short space of time to the business of other persons, from whom he receives no compensation.

The same learned judge, in Maisch v. Saving Fund, 5 Phila. 30, laid down the rule as follows: " As to the directors, however, receiving no benefit or advantage, they can be considered only as gratuitous mandatories, liable only for fraud or such gross negligence as amounts to fraud." Again, in Spering's Ap., supra, he said: " Indeed, as the directors are themselves stockholders, interested, as well as all others, that the affairs and business of the corporation should be successful, when we ascertain and determine that they have not sought to make any profit not common to all the stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill.",

We may also refer to Briggs, Receiver, v. Spaulding, 141 U. S. 132, which goes even further than our own cases upon this point. It does not relieve a director from the consequence of gross negligence in the performance of his duty, but it holds that he is not responsible where he has used the ordinary care which bank directors usually exercise. It is true this was the case of a national bank, but we apprehend that what is negligence on the part of a director of a national bank, would, as a general rule, be negligence by a director of a state bank, and subject to the same liability.

In regard to what is ordinary care, regard must be had to the usages of the particular business. Thus, if the director of a bank performed his duties, as such, in the same manner as they were performed by all other directors of all other banks in the same city, it could not fairly be said that he was guilty of gross negligence. And care must be taken that we do not hold mere gratuitous mandatories to such a severe rule as to drive all honest men out of such positions. This thought is so well expressed by Sir George Jessel, M. R., in his opinion in In re Penn Coal Mining Co., 10 Ch. Div. 450, that I give his remarks in full: " One must be very careful in administering the law of joint-stock companies, not to press so hard on honest directors as to make them liable for these constructive defaults, the only effect of which would be to deter all men of any prop-

erty, and, perhaps, all men who have any character to lose, from becoming directors of companies at all. On the one hand, I think the court should do its utmost to bring fraudulent directors to account; and, on the other hand, should also do its best to allow honest men to act reasonably as directors. Willful default no doubt includes the case of a neglecting to sue, though he might, by suing earlier, have recovered a trust fund; in that case he is made liable for want of due diligence in his trust. But I think directors are not liable on the same principle."

Holding, then, the rule to be that directors, who are gratuitous mandatories, are only liable for fraud, or for such gross negligence as amounts to fraud, it remains but to apply this principle to the facts of this case.

It is not alleged—it has never been alleged—that the hands of these directors are stained by fraud. The bank was wrecked by its president, with the cashier and some of the clerks aiding and abetting. It was adroitly done, so far as the means were concerned, and it was concealed wholly from the directors. False entries were made in the books, and false accounts, or accounts with fictitious persons, were opened so as to hide the theft. The reports of the bank's condition, made by the president to the directors, from time to time, showed it to be in good condition, while in point of fact it was honeycombed with fraud, and its assets squandered in wild speculations. It may be asked, why did not the directors discover this by an examination of the books? The answer is, that, if they had examined every book in the bank, with a single exception, they would not have found the fraud. That exception is the individual ledger. All the frauds were dumped into this book, and appeared nowhere else. The individual ledger contains the accounts of the individual depositors, and this book, by the rules of a large majority of the Pittsburgh banks, the directors are not allowed to see. This is a rule of policy on the part of most city banks, and the reason for it is, at least, plausible. A director, largely engaged in business, may have a number of rivals in the same business who are depositors in the bank. If he is permitted to examine their accounts it gives him an advantage and an insight into a rival's affairs that few business men would tolerate. Hence, it is a question with many banks

whether to adopt this rule or lose valuable customers, and they generally prefer the former. We are not speaking of the wisdom of the rule, only of its existence, as bearing upon the question of the director's negligence. Are they to be held to be guilty of gross negligence in not examining a book, which, by the rules of their own bank, and of four fifths of the other banks in Pittsburgh, the directors were not permitted to see?

Nor do we think the directors were bound to regard the statements submitted to them as false, and the president, cashier and clerks as thieves. They had nothing to arouse suspicion. All of these gentlemen stood high; they were the trusted agents of the corporation; paid for their services, and regarded in the community in which they lived as honest men.

Aside from this, the directors were among the heaviest stockholders of the bank. They collectively owned a large proportion of it. And so thoroughly were they deceived by the president as to its condition that, when the first stoppage occurred, they not only believed the suspension was temporary, but they showed their faith by their works, and upon their individual credit raised the sum of $289,000 to enable it to resume. They did not desert the ship like a parcel of drowning rats, but imperiled their private fortunes in an effort to keep it afloat. Under such circumstances it would be an act of gross injustice to hold them liable for the frauds of others, in which they had not participated—of which they had no knowledge—and which have only been brought to light with the aid of experts. We must measure this transaction by the light which these directors had at the time the transaction occurred. It would be unfair to judge them by the calcium light which has been turned on for six years, and which has enabled us to trace at last the sinuous path of Riddle and his confederates in crime, and the means by which this bank has been robbed and plundered. We are of opinion that the master and the court below were right in their conclusion, and the decree is affirmed upon the appeal of the assignee, and the appeal dismissed at his costs.

### HUTCHINSON'S APPEAL.

This was a cross-appeal from the same decree as that in Warner's appeal. It was taken by the directors of the bank, and they complain that "the court below erred in imposing

upon the directors, the defendants below and appellants here, the costs of this case, including a master's fee of $2,500."

Costs in equity are in the sound discretion of the court, and we always hesitate to reverse for the exercise of such discretion. In this case, however, the directors have been compelled to defend themselves for years against litigation, which a careful and dispassionate examination of the case, at the proper time, would have shown to be without merit. Having succeeded in vindicating themselves from the charges made against them, we do not think they should now be compelled to pay the costs. The general rule is that the losing party shall pay the costs of his unsuccessful litigation, and we see nothing in this case to take it out of this rule.

The decree is reversed as to costs, and it is ordered that the costs here and below, including the master's fee, be paid out of the funds in the hands of the assignee.

Thomas Hare, one of the defendants, assigns as error upon this appeal, that the court below erred in making and entering the sixth paragraph of the decree, which orders him to pay to the said assignee the sum of $3,716.23, with interest thereon from May 26, 1884, less five and seven eights per cent of the principal sum, said deduction being the amount of the dividend paid by the assignee to creditors upon the distribution, heretofore made by said assignee.

The facts are as follows: Thomas Hare and son, appellant's firm, had the sum of $3,716.23 on deposit in the Penn Bank, on the day the bank finally closed. Being in the bank at the time, he drew this money out. The master and the court below held that he had no right to do so, and thus obtain a preference, after the bank had closed. There could be no doubt about this if the money had been his individual money. But he contends, that because it belonged to his firm he had a right to withdraw it. We think it is a distinction without a difference. It was his act, and even if we treat it as the act of the firm, it was done upon information obtained by him in his confidential relation as a director of the bank. We think the decree against him was properly entered, and his appeal is dismissed at his costs.