BAILEY et al. v. BABCOCK et al.

(District Court, W. D. Pennsylvania. May Term, 1915.)

No. 24.

1. BANKS AND BANKING ☞253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
  Under National Bank Act (Rev. St. § 5239 [Comp. St. 1916, § 9831]), providing that if the directors of any national banking association shall knowingly violate or knowingly permit any of its officers, etc., to violate any of the provisions of that title, every director participating therein shall be personally liable, the test of civil liability is whether the directors "knowingly" violate, or "knowingly" permit the violation of the statute.
  [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. BANKS AND BANKING ⬳253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
Under common-law principles, directors of a national bank are not answerable for mistakes or errors of judgment, however serious, if they act in good faith and no dishonesty appears.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

3. BANKS AND BANKING ⬳253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
National bank directors must bring to the discharge of their duties reasonable and ordinary care and diligence in conducting the affairs of the corporation, and are answerable for the results of negligence.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

4. BANKS AND BANKING ⬳269—NATIONAL BANKS—POWERS.
While a national bank has no power to carry on a manufacturing, mining, or trading business or to engage in a speculative enterprise, and cannot do so indirectly by the taking of stock, it may, in some cases, advance money to further an enterprise for the sole purpose of enabling it ultimately to secure a debt owing to it in some form.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 370.]

5. BANKS AND BANKING ⬳253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
A bankrupt partnership was indebted to a national bank. H. and S., one of the partners, were interested in certain timber lands, and the bank advanced money to buy the timber purchased, and bought the bonds of a lumber company to which the timber was conveyed, and financed the lumber company. The lumber company's stock was divided between H., S., and the bank, but it was all to be held by the bank until advances were repaid out of dividends; and S.'s shares were also to be held until the partnership debt was paid. The directors entered into the project to recoup the bank for the partnership debt, and it was their intention to turn over all of the stock to S. after the bank was paid. They acted in good faith. They caused a cruise to be made of the timber, which was substantially correct, and did not pay an excessive price therefor as the market then stood, but because of expensive operating expenses, much of the timber proving defective and depressed business conditions, the enterprise caused loss to the bank. Held, that if the transaction was ultra vires, it was not clearly so, and the directors were not personally liable.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

6. BANKS AND BANKING ⬳253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
While the directors would be liable for any loss occasioned through their negligence, the question of negligence was to be determined from the facts as they presented themselves at the time the transaction was entered into, and not as illumined by subsequent events.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

7. BANKS AND BANKING ⬳253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
The directors were not guilty of negligence, but merely of an error of judgment not rendering them liable, especially as the fact that they sought to make no personal profit raised a strong presumption that they used their best judgment and skill.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

8. BANKS AND BANKING ⬳253, 269—NATIONAL BANKS—LIABILITY OF DIRECTORS.
Though the corporate bonds were secured by a mortgage, the transaction did not amount to a loan within Rev. St. § 5137 (Comp. St. 1916, § 9674) forbidding loans on real estate or the prohibition against loans in excess of 10 per cent. of the capital and surplus, and, if it was a loan in violation of the statute, it was not a violation, knowingly and intentionally rendering the directors liable.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 349, 370.]

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. BANKS AND BANKING &=253—NATIONAL BANKS—LIABILITY OF DIRECTORS.
The purchase of corporate bonds by a national bank for 90 per cent. of their face value, if usurious, did not impose personal liability upon the directors under Rev. St. § 5239 (Comp. St. 1916, § 9831), where no damages were sustained thereby.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 349.]

Suit by Samuel Bailey, Jr., and another, Receivers of the Federal National Bank of Pittsburgh, against Frederick R. Babcock and others. Bill dismissed.

John S. Wendt, of Pittsburgh, Pa., for plaintiffs.

Patterson, Crawford, Miller & Arensberg, of Pittsburgh, Pa., for defendant Babcock.

Stone & Stone, of Pittsburgh, Pa., for defendants Landis and Price.

S. S. Robertson, of Pittsburgh, Pa., for defendant Mulert.

Mehard, Scully & Mehard, of Pittsburgh, Pa., for defendants Cooper and Craig.

W. H. Lemon, of Pittsburgh, Pa., for defendant Eisenbeis.

Andrew G. Smith, of Pittsburgh, Pa., for defendants Yost and Todd.

Langfitt & McIntosh, of Pittsburgh, Pa., for defendant Roberts.

THOMSON, District Judge. This is a bill in equity by which the receivers of the Federal National Bank seek to hold the defendants who were directors of that corporation, liable for losses incurred by the bank, aggregating in amount about $200,000.

## Findings of Fact.

First. The Federal National Bank, located in the city of Pittsburgh, was organized in 1901, with a capital stock of $2,000,000, and continued business until the fall of 1903, when it was closed by the Comptroller of the Currency and a receiver appointed. In December of the same year, the bank was reopened, its capital stock reduced to $1,000,000, with apparent surplus of about the same amount. The bank continued in business until December 17, 1913, when, owing to large losses and pursuant to a resolution of the board of directors, which was afterwards approved by the stockholders, it was placed in voluntary liquidation, and later, in August, 1914, by virtue of a proceeding and decree in equity, the plaintiffs herein were duly appointed receivers by this court.

Second. All the defendants named herein were directors of the bank during the years 1908 to 1913, both inclusive. During the year 1908, W. A. Dinker, John Murphy and John E. Haines were also directors, as was Hugh Young, during that portion of the period prior to his death, which occurred in October of 1912. During said period Hugh Young was president, until January of 1910, being succeeded by John H. Jones, who served until September of 1913, he being succeeded by F. R. Babcock, who served until the bank went into liquidation. H. M. Landis was cashier of the bank during the whole of said period.

Third. The partnership of R. M. Smith & Co., composed of R. M. and J. H. P. Smith, wholesale lumber dealers at Parkersburg, W. Va.,

being indebted to the bank for money loaned and paper discounted,. in the early part of 1908 became bankrupt, individually and as partners, and on the liquidation of the estate there remained due to the bank about $69,000, which amount it became apparent, the bank would lose.

Fourth. One F. O. Havener, with Mead and others, were the owners of a certain timber tract of 7,302 acres, located in the mountains of Fayette county, W. Va., and had organized the Sewell Lumber Company, a corporation of West Virginia, with a view of turning over said tract to the company. R. M. Smith and Havener had gone over the property, examined the timber and location of the tract with reference to its accessibility and operation. In the fall of 1908 they met William A. Roberts, a director of the Federal National Bank at Parkersburg, W. Va., where he had been spending considerable time in looking after the interests of the bank in connection with the aforesaid bankrupt estate, and laid the timber proposition before him with a view of getting him to associate himself with them in the property, and aid in financing the operations. A little later Smith and Havener came to Pittsburgh, interviewed Mr. Roberts, and at the latter's suggestion they went to see F. R. Babcock, who was extensively engaged in the lumber business, and was a director in the bank. Smith and Havener submitted to Mr. Babcock, and afterwards to the bank, an estimate or prospectus showing the estimated cost of the timber lands and the construction of the necessary plant and equipment, which showed that the timber land to be acquired contained 60,000,000 to 70,000,000 of feet of timber of various kinds, and that on the estimated basis of the cost, including the cost of manufacture and sale, the profits would amount to from $250,000 to $500,000 or $600,000. Shortly prior to December 23, 1908, when the proposition was laid before the board of directors of the bank, they appointed a committee consisting of Babcock, Price, and Yost to consider the matter and make report. The committee conferred with Stephen Stone, their attorney, received from him a written opinion in relation to the matter, and made a favorable report to the bank. At the request of the bank, Mr. Babcock sent a competent man, Mr. Penrod, to examine and estimate the timber, who made report that there were about 69,000,000 of feet of the tract.

Fifth. The plan devised and finally agreed upon was in substance as follows: The bank was to advance to Havener money to buy the timber, for which the owners were to receive approximately $160,000 in cash. Havener was to take title to the property and convey the same to a corporation. To provide for the payment of the purchase money, including the payment of the liens on the property, the erection of the mill, railroad track, houses, and so forth, it was arranged that the lumber company should issue bonds to the amount of $250,000, secured by a mortgage or trust deed on the property, these bonds to be purchased by the bank at 90 and the money advanced as required, the said Havener agreeing to guarantee the payment of $50,000 of said bonds. The stock of the corporation was to be divided into three parts, one to Havener, one to Smith, and one to the bank. Except as to the qualifying shares, the stock was to be issued in the name of H. M. Landis,

cashier of the bank, to be by him impounded or held in trust until all the moneys advanced by the bank should be paid, at which time Havener was to receive his 300 shares outright. The remaining shares were to remain in the possession of Landis until the company had earned sufficient money through the medium of dividends on stock, to pay and discharge the debt of $69,000 which Smith owed to the bank.

Sixth. This general arrangement was carried into effect. On December 30, 1908, Havener gave to the bank a demand note, receiving from the bank the money with which he bought the Smiley interest in the tract. About January 28, 1909, he purchased the remaining interests, the first payment, amounting to $60,000, being advanced by the bank, Havener giving his note therefor. The vendors of the timber being the owners of the charter of a West Virginia corporation with a nominal capitalization, known as the Sewell Lumber Company, the rights of the incorporators of that company were transferred to certain clerks in the office of Mr. Stone, the attorney, and the stock of that company was increased to 900 shares of the par value of $100. Havener conveyed the timber lands to the corporation, which paid up its capital stock, the company assuming the unpaid purchase money on the timber, represented by lien notes maturing one-half in January, 1910, and one-half in January, 1911. The corporation then issued bonds dated March 1, 1909, maturing in ten years, secured by a mortgage on the timber lands, to the Colonial Trust Company of Pittsburgh as trustee for the holders of the bonds. The former directors selected by Mr. Stone resigning, F. O. Havener, Stephen Stone, H. M. Landis, G. W. Eisenbeis, and F. R. Babcock were elected directors in their place. The board of directors of the bank having passed a formal resolution to purchase the bonds, $100,000 of bonds were executed and delivered to the bank, the bank passing a credit to the Sewell Lumber Company for $100,000, and the latter giving its check on the bank for $10,000, which was treated as profits, the bonds being carried on the books at par. Certificates of stock were then issued, to F. O. Havener 300 shares, H. M. Landis 597 shares, and 1 share each to Babcock, Eisenbeis, and Stone. These certificates were indorsed in blank and turned over to the bank under the arrangement heretofore referred to.

Seventh. In February, 1909, the Sewell Lumber Company entered into a contract with E. V. Babcock & Co., in which the latter agreed to sell all the manufactured product for the consideration of 5 per cent. of the selling price, all accounts of purchasers being guaranteed by the selling agent. This contract was reasonable in terms and advantageous to the lumber company.

Eighth. By letter of January 28, 1911, the bank agreed with Smith that when all the unsecured indebtedness of the lumber company to the bank had been fully paid and the first mortgage bonds redeemed and canceled, and all notes upon which Smith then was or might thereafter become maker or indorser were paid, to deliver to him 400 shares of the stock of the lumber company, the agreement being contingent upon Smith's remaining with the lumber company as general manager of its operations until such indebtedness was paid in full.

Ninth. While the written documents show that the bank had such

ownership of the one-third, afterwards two-ninths of the stock of the lumber company as would have enabled it to hold the same after all the indebtedness of Smith was paid, the evidence satisfies me, and I so find, that the purpose of the directors in entering into the project was to recoup the bank for the debt of Smith. That holding the stock in this way was intended as an incentive to Smith to put forth his best exertions as manager of the lumber company, and that, while there was no formal agreement of the bank to turn it over to him, it was nevertheless their intention to turn over its entire stock holdings to Smith after he had paid the bank in full. In other words, the stock was really taken and held in the manner stated, as security for the money owing to the bank and that advanced by it in the timber transaction.

Tenth. Under conditions as they existed, operations were much more expensive than had been anticipated, and in addition to the $225,-000 raised by the sale of its bonds, the lumber company borrowed from the bank from time to time additional sums to the amount of $135,000 on notes of the Sewell Lumber Company indorsed by Havener. In 1911 an adjoining tract of about 4,000 acres, known as the Ephraim Creek property, was offered for sale, and after the timber had been cruised and estimated at 26,000,000 feet, the property was purchased in August of 1911, and conveyed to the Sewell Lumber Company for the price of $100,000. Of this $25,000 was paid in cash, and the balance by the assumption of three notes of $25,000 each, which were secured by a vendor's lien maturing in one, two, and three years thereafter. When this purchase was in contemplation, Mr. Havener, having suffered severe losses, was unable when called on to provide for the payment of his one-third of the purchase money. As a result, it was arranged that he should transfer his stock, subject to the lien rights of the bank therein, to H. M. Smith, and be released from his guaranty on the $50,000 of bonds and also on his liability as indorser of the notes of the Sewell Lumber Company. In this way, the bank would hold Havener's stock, then in the hands of Smith, in the same manner as Smith's remaining stock was held.

Eleventh. With a view of lowering the cost of production and greatly increasing the output, in the year 1913 expenditures were made by the company consisting of a new band mill and machinery, the extension of the railroad and certain buildings and equipment, aggregating in amount about $60,000. The Sewell Lumber Company being unable to pay its debts, on September 1, 1914, after the closing of the Federal National Bank, on bill of complaint filed for that purpose, a receiver was appointed by the circuit court of Fayette county, W. Va., who sold the property of the company to the Babcock Coal & Coke Company for $230,000. After distribution of the proceeds of the sale of the property and all the assets of the Sewell Lumber Company, there remains due to the Federal National Bank an amount, with interest, of approximately $200,000.

Twelfth. The failure of the enterprise is doubtless attributable to a combination of causes. It does not appear that it failed because of an overestimate of the amount of timber on the land, or, under normal conditions, that the price at which it was purchased was excessive.

Operations were much more expensive than at first contemplated, and much of the timber proved somewhat defective. The project was launched at an unfavorable time. Business was prostrate as a result of the panic of 1907, and it had not revived in 1908. While the depressed conditions furnished a favorable market to buy, it could scarcely have been anticipated that prices would continue low and the market dull during the greater portion of the period of their expected operations, which unfortunately proved to be the fact.

Thirteenth. The directors, before entering into the transaction, laid the matter before their counsel and took his advice thereon, and thereafter during the progress of the matter the legal phases of the case were in the hands of and directed by their counsel.

## Conclusions of Law.

First. Under all the facts of the case, the defendants are not liable for the loss sustained by the Federal National Bank, as charged in the bill of complaint.

Second. The bill should be dismissed, with costs.

## Discussion.

The court in this case is called to pass upon the question of the legal liability of the directors under the facts as disclosed by the evidence. With the propriety or impropriety, the wisdom or folly of this act or that, as viewed in the light of subsequent events, we have no concern whatever, save only as such acts may bear on the ultimate question of defendants' liability in this action.

It must always be at matter of deep concern to a court of equity to know with what motive and purpose they against whom its decree is sought acted in the premises. Were their actions inspired by an honest purpose, did they act in good faith, or was the transaction tainted with corruption and fraud? This inquiry, while not necessarily conclusive on the question of liability, is always vital and fundamental. The court is thoroughly satisfied under the evidence that the defendants acted from the inception to the end of the transaction in entire good faith, that they sought thereby to gain no personal advantage or profit, save that in which all the stockholders of the bank would share, and that their sole purpose was to recoup the bank for the large loss which it had sustained. It is true that F. R. Babcock was a member of the firm of E. V. Babcock & Co., which acted as the selling agent of the lumber, and was interested in the Babcock Coal & Coke Company, which ultimately became the purchaser of the Sewell Lumber Company property at the receivers' sale. But the evidence shows conclusively that the contract of the selling agency was a fair one in all respects, reasonable in its terms, and advantageous in its operation to the lumber company. The evidence also shows that the price obtained for the property at receivers' sale was the highest and best that could be obtained. I find nothing in the evidence which would justify the conclusion that Mr. Babcock acted otherwise than with honesty and good faith in common with the other members of the board. Considered, therefore, from this viewpoint of good faith and honesty of purpose on the part of the directors, we must determine what legal prin-

ciples are applicable to the facts, most of which are not seriously in dispute.

The illegal acts charged against the defendants fall into two classes: First, those which are claimed to be violations of the National Bank Acts; and, second, those which are alleged to constitute a breach of duty by the directors as agents of the bank, under the common law.

[1] It is entirely clear under the authorities that a different measure of liability must be applied in the two cases. In the former the duty imposed is that enjoined by the statute; and, where a statute creates a duty and prescribes a penalty for nonperformance, the rule provided in the statute is the exclusive test of liability. Turning to section 5239 of the Bank Act, which undertakes to fix the penalty for any violation of the statute, we find that it provides as follows:

"Section 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this title. all the rights, privileges, and franchises of the association shall be thereby forfeited. * * * And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." Comp. St. 1916, § 9831.

In Yates v. Jones National Bank, 206 U. S. 179, 27 Sup. Ct. 638, 51 L. Ed. 1002, this phase of the question is very carefully considered by the Supreme Court. In that case the Supreme Court of Nebraska, affirming the decision of a state court, had held the directors of a national bank liable for making false statements to the Comptroller of the Currency. It had held that the means of information were accessible to them, and whether the attesting directors possessed knowledge of the falsity of the report was wholly immaterial. The judgment of the court below was reversed, on the sole ground that it did not appear that the violation in question was intentional. After citing section 5239 and the various sections of the bank act enjoining the doing or not doing of certain acts by the association or its officers, the court said:

"Considering the text of the National Bank Act, as now embodied in the Revised Statutes, including section 5239, we think the latter section affords the exclusive rule by which to measure the right to recover damages from directors based upon a loss alleged to have resulted solely from the violation by such directors of a duty expressly imposed upon them by a provision of the act. By the first sentence of the section mentioned a forfeiture of the charter is entailed 'if the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this title.' And the last sentence ordains the rule by which civil liability is to be determined, by providing that 'every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation.' As the section thus comprehends all the express commands to do or not to do, as to directors, contained in the National Bank Act, and besides specifies the nature of the conduct of directors from which their civil liability for violation of such commands may arise, it results that liability cannot be entailed upon them by exacting a different and higher standard of conduct as regards such commands than that established by the statute without depriving directors of an immunity conferred upon them. That the words 'shall knowingly violate, or knowingly permit,' etc., found in the first sentence of section 5239, Revised Statutes, were intended to express

the rule of conduct which the statute established as a prerequisite to the liability of directors for a violation of the express provisions of the title relating to national banks is additionally shown by the oath which a director is required to take, wherein, as already stated, he swears 'that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of this title.' Mark the contrast between the general common-law duty to 'diligently and honestly administer the affairs of the association' and the distinct emphasis embodied in the promise not to 'knowingly violate, or willingly permit to be violated, any of the provisions of this title.' In other words, as the statute does not relieve the directors from the common-law duty to be honest and diligent, the oath exacted responds to such requirements. But as, on the other hand, the statute imposes certain express duties and makes a knowing violation of such commands the test of civil liability, the oath in this regard also conforms to the requirements of the statute by the promise not to 'knowingly violate, or willingly permit to be violated, any of the provisions of this title.' "

The court holds that the court below imposed a higher standard of conduct than that required by the statute, and that where liability arises from the violation of a statute knowingly something more than negligence is required; that the violation must "in effect" be intentional.

I have quoted this decision at much length because of its clear exposition of the statute. It may be said there is some modification of the rule above laid down, in the case of Thomas v. Taylor, 224 U. S. 73, 32 Sup. Ct. 403, 56 L. Ed. 673. Between these decisions there is no conflict as I read them. The opinion in each case must be read in the light of its own facts. In that case the Comptroller of the Currency had given notice to the directors of a national bank to collect or charge off certain assets as doubtful. In disregard of this notice, a statement was made representing the assets to be good, and it was held that the directors had disregarded the direction of the officers appointed by the law to examine the affairs of the bank, whose directions must be observed, and that a violation is in effect intentional, when one deliberately refuses to examine that which it is his duty to examine. This case was again before the Supreme Court (240 U. S. 541, 36 Sup. Ct. 429, 60 L. Ed. 788), and the court affirmed again that the test of liability was not negligence, but the fact that the act was violated knowingly; and, referring to the action of the directors in Thomas v. Taylor, the court said:

"Their reckless report and disregard of the official direction was found to have the quality of an intentional breach of the defined duty."

It is clear, therefore, that the words of the statute "knowingly violate, or knowingly permit to be violated," still stand as the test of civil liability. These words are not obscure or of doubtful meaning, and must be given effect in applying the statute.

[2, 3] What is the measure of liability where there is an alleged breach of duty by directors, under the principles of the common law? If this liability is measured by the oath under the sanction of which they act, they must "diligently and honestly administer the affairs of the association."

Under the authorities, it seems entirely clear that if no dishonesty appears, if the directors act in good faith, they are not answerable for a mistake or error of judgment, however serious. But for the

results of negligence they are answerable. They must bring to the discharge of their duties reasonable and ordinary care and diligence in conducting the affairs of the corporation.

These propositions are fully sustained by the authorities, both state and federal. A leading case in Pennsylvania is Spering's Appeal, 71 Pa. 11, 10 Am. Rep. 684. In this case, referring to directors the court said:

"They can only be regarded as mandatories, persons who have gratuitously undertaken to perform certain duties, and who are therefore bound to apply ordinary skill and diligence, but no more. Indeed, as the directors are themselves stockholders, interested as well as all others that the affairs and business of the corporation should be successful, when we ascertain and determine that they have not sought to make any profit not common to all the stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill. * * * Upon a close examination of all the reported cases, although there are many dicta not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, or where such fraud might have been prevented had they given ordinary attention to their duties."

This case was followed by the well-considered case of Watts' Appeal, 78 Pa. 370, in which the principles of Spering's Appeal are approved, the court saying:

"From this case we learn that directors are mandatories only, and, as such, held to but ordinary skill and diligence, and are not responsible to their fellow corporators for the want of judgment and knowledge. They are personally liable only where they are guilty of fraudulent conduct or of acts clearly ultra vires."

This principle is supported in the case of Hodges v. New England Screw Company, 1 R. I. 312, 53 Am. Dec. 624, the latter case citing Penn Coal Mining Co., 10 Ch. Div. 450.

The case of Swentzel v. Penn Bank, 147 Pa. 140, 23 Atl. 405, 415, 15 L. R. A. 305, 30 Am. St. Rep. 718, follows the same course of reasoning and reaches the same conclusion. It holds that bank directors, being gratuitous mandatories, are only liable for fraud or for such gross negligence as amounts to fraud. If they use the ordinary care which bank directors usually exercise, they will not be liable for misappropriations by the officers of the bank, and in determining what is ordinary care, regard must be had to the usages of the particular business.

In Loan Society of Philadelphia v. Eavenson, 248 Pa. 407, 94 Atl. 121, where the directors were held liable, the court said:

"This result was obtained by holding the defendants responsible for gross negligence in the performance of their duties as directors, which certainly is no higher degree of care than reason or precedent imposes. The rule generally applied is reasonable and ordinary care, skill and diligence in conducting the business of the corporation. The learned chancellor did not transgress this standard, and did not adjudge the defendants at fault merely because of an error of judgment. This is the standard adopted in this state, and the failure to observe it imposes liability on a defaulting director. The question is discussed in Spering's Appeal, 71 Pa. 11 [10 Am. Rep. 684], which is a leading case on the subject."

The decisions in Pennsylvania appear to be in harmony with those of the Supreme Court of the United States. A leading case is Briggs v.

Spaulding, 141 U. S. 132, 11 Sup. Ct. 924; 35 L. Ed. 662. Spering's Appeal and other leading cases are cited in the opinion, and the court held, in substance, that directors of a national bank must exercise ordinary care and prudence in the administration of the affairs of the bank. They are entitled, under the law, to commit the banking business as defined, to their duly authorized officers, but this does not absolve them from the duty of reasonable supervision, and that they cannot shield themselves from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention. The court quotes from the opinion of Justice Field in Preston v. Prather, 137 U. S. 604, 11 Sup. Ct. 162, 34 L. Ed. 788:

"No one taking upon himself a duty for another without consideration is bound, either in law or morals, to do more than a man of that character would do generally for himself under like conditions."

It remains to apply the measure of liability which the law has established to the facts of the case as found.

The substance of plaintiffs' charges against the defendants as I understand them, are:

First. That the defendants invested funds of the bank in the organization and operation of the Sewell Lumber Company, which transaction was ultra vires of the bank.

Second. That the directors were guilty of negligence in advancing the moneys to the lumber company, whether the same be regarded as an investment or a loan.

Third. If the advancement be regarded as a loan, it was in excess of the limit of 10 per cent. of the capital and surplus, and therefore illegal.

Fourth. If a loan, the directors violated section 5137 of the Revised Statutes (Comp. St. 1916, § 9674), forbidding national banks to make loans on real estate.

It is apparent that if the bank were making an investment of its funds, it could not, by the same act, be loaning its money in any capacity. If an investment, the amount and manner of the advancement, and the form of security, would be merely incidents or details, and, however carried on the books, could not be treated as a loan to a third party under the provisions of the banking act.

[4, 5] As to the ultra vires character of the transaction: It is, of course, true that a national bank has no power to carry on a manufacturing, mining, or trading business, or to engage in a speculative enterprise, because the statutes of the United States are the measure of their powers, and they cannot rightfully exercise any powers except those expressly granted or which are incidental to carrying on the business for which they were established. Logan v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; California Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198.

Generally speaking, therefore, for the bank to attempt to carry on the business of manufacturing and selling lumber, either by itself or through an agent, would be an act clearly and plainly ultra vires. Having no authority to engage in such business directly, a bank has no au-

thority to engage in such business by the taking of stock. First National Bank v. Converse, 200 U. S. 425, 26 Sup. Ct. 306, 50 L. Ed. 537.

While the foregoing propositions are perfectly plain, there is a border line not well defined, a twilight zone, between those cases where a bank acquires a property and conducts a business as an independent speculation, and those cases where the directors, solely for the purpose of enabling the bank ultimately to secure a debt owing to it in some form, advances the money to further the enterprise. In Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, it is held that when a national bank has lawfully acquired real estate or other property, it may sell it and convert it into money; and in order to do so may clean it, make reasonable repairs, and put it in a condition to attract purchasers, as an individual of sound judgment and prudence would do to effect a sale; that these powers, while not directly granted, are incidental to the powers vested in the corporation under section 5136 of the Revised Statutes (Comp. St. 1916, § 9661); that the duty of exercising this power and determining to what extent it shall be exercised is intrusted to their judgment; and that when carefully considered and honestly decided, they ought not to suffer, if, in the light of subsequent events, it turns out that their decision was unfortunate. But having repaired the property (in this case an undeveloped mine), pumped out the water, and put the property in condition for sale, it was held that they were answerable for the subsequent loss occasioned by prospecting for paying ore on the property where none of value had ever been found.

In Cockrill v. Abeles, 86 Fed. 505, 30 C. C. A. 223, it was held that where a national bank has lawfully acquired an interest in real property in satisfaction of a debt, it may purchase other undivided interests therein or incumbrances thereon, provided such action is necessary to enable it to manage or dispose of the property to a better advantage. But having so acquired it, when the directors organized a corporation among themselves for the purpose of operating the mills as the bank's agent, using its funds, and operated the mills for the bank at a loss, the directors were liable. Judge Thayer, who wrote the opinion, used this language:

"The most liberal view which may be fairly taken of the implied powers of national banks would not sustain their right to engage directly in a manufacturing or business enterprise under any circumstances; but, even if the power in question should be conceded to exist under certain conditions, the present case was not one which warranted this exercise."

In the same case Judge Sanborn said:

"I concur in the order reversing the decree in this case, because the bill shows that the appellees unlawfully diverted some of the funds of the insolvent bank to the payment of unearned dividends to themselves and other stockholders; * * * but I am unable to assent to the view that the bill sufficiently sets forth any cause of action against the appellees on account of the Quapaw Mills transaction."

In the same case Judge Philips said:

"I concur in the view expressed by Judge Thayer respecting the Quapaw Mills transaction, with the qualification that it is based on the averments of the bill, whereby it is made to appear that the directors of the bank acquired

and conducted this property as an independent speculation rather than as a means, according to the best judgment of the directors, of securing an indebtedness to the bank. If this property in fact was taken by the directors solely for the purpose of enabling the bank ultimately to secure the debt owing to it, and in the progress of its operation and management it became necessary, in the honest judgment of the directors, to advance the money to enable the mill to be successfully operated, so as ultimately to work out the best interests of the bank in the property, I do not think the directors should be held liable for bad judgment in the transaction."

In First National Bank v. National Exchange Bank, 92 U. S. 128, 23 L. Ed. 679, the question was whether a national bank may, in a fair bona fide compromise of a contested claim against the bank, pay a larger sum than would have been exacted in satisfaction of the demand, so as to obtain by the arrangement a transfer of certain stocks in railroad and other corporations; it being honestly believed at the time that by turning the stocks into money under more favorable circumstances than then existed a loss might be averted or diminished. The court answered this question in the affirmative, holding that such a transaction would not amount to a dealing in stocks, and that a prohibition against trading and dealing is nothing more than a prohibition against engaging in the ordinary business of buying and selling for profit, and did not include purchases resulting from ordinary banking transactions; that the transaction must be taken to have been a fair and honest compromise of an outstanding claim, with a view to ultimate protection against an impending loss, and was within the corporate powers of the bank.

In California v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed 198, it was held that, while no express power to acquire the stock of another corporation is conferred upon a national bank, as incidental to the power to loan money on personal security, a bank may, in the usual course of such business, accept stock of another corporation as collateral, and by the enforcement of its rights as pledgee, it may become the owner of the collateral and be subject to liability as other stockholders.

In Merchants' National Bank v. Wehrmann, 202 U. S. 295, 26 Sup. Ct. 613, 50 L. Ed. 1036, the question was as to the liability of a national bank for the debts of a partnership, the bank having taken as security for a debt shares in the firm, represented by transferable certificates, of which it afterwards became the owner. The court held that it did not follow that because the interest in a partner-ship is represented by a paper certificate in form resembling a certificate of stock in a corporation, a national bank can take the partnership certificate to the same extent that it could take the stock. That a corporation is legally distinct from its members, and its debts are not theirs, but that when a similar transfer is made of a share in a partnership it means that the transferee at once becomes a member of the firm and goes into its business with an unlimited personal liability, which a national bank has no authority to do.

In the light of the foregoing authorities, it could scarcely be said that the investment of the funds of the bank in the bonds of the corporation was clearly ultra vires. When the corporation was formed, Havener through his options had controlled the purchase, and had

$10,000 invested, and Smith became the general manager of the company and the owner of 300 shares of the corporation's stock. These the bank had a right to take in pledge as security for Smith's large indebtedness to the bank. If the bank, by investing its money in what appeared to be safe securities, could give such value to a debtor's stock as would enable that debtor to discharge his indebtedness by a pledge of his stock to the bank, such a transaction would appear to be legitimate, and apparently within, certainly not clearly beyond, the legal powers of the bank. As the bank had no legal right or title to the property, it could not be said, in any proper sense, that it was engaging in a speculative enterprise, unless by reason of its holding the stock of the corporation it intended and expected to reap profits in the shape of dividends after the discharge of its indebtedness. But if it took and held the stock simply as security for its debt, it was neither theoretically nor actually a speculative venture. In the situation, when the proposition was laid before the directors, they took the advice of competent counsel, who outlined a course which he thought was feasible. From the reading of his letter, dated December 24, 1908, it is entirely clear that he meant, and was intended to be understood, that the method of procedure therein outlined was legal, and within the lawful powers of the directors to pursue, but that whether the directors should entertain the proposition at all was purely a matter of good business judgment. Knowing Mr. Stone as they did, and having faith in his learning and integrity, they could not but understand from his letter that if satisfied with the proposition from a business standpoint, their procedure would be regular and lawful. Under these circumstances, if the investment is to be regarded as technically ultra vires, I do not feel that the defendants should be held to answer for the loss which seems fairly chargeable to an error in business judgment. Under the authorities, where the question of ultra vires is involved in doubt, the cases go far to hold that the advice of counsel is a protection to the trustee or director who has sought such advice and honestly acted under it. Spering's Appeal, supra; Lewin on Trusts, 595; Calhoun's Estate, 6 Watts (Pa.) 189.

[6,7] Notwithstanding this, however, the directors would still be liable for the loss suffered by the bank if that loss was occasioned through their negligence, their failure to bring to the discharge of the duties that ordinary care which the circumstances of the case reasonably demanded. In this, as in every other case, negligence is a question of fact under all the circumstances. And in passing on this question, we must keep in mind that the facts must be viewed and considered as they then presented themselves, and not from the illumined viewpoint of subsequent events. These directors were all stockholders of the bank, and some of them among the heaviest owners of its stock. As was said by the learned judge in Spering's Appeal:

"As the directors are themselves stockholders, interested as well as all others that the affairs and business of the corporation should be successful, when we ascertain and determine that they have not sought to make any profit not common to all stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill."

These directors were men of affairs, many of them very successful in the business world. One of them, Mr. Babcock, had been in the lumber business for many years. When the proposition was laid before him he consulted with his brother, who by reason of his wide experience might be regarded as an authority in the lumber business. The board thus had the benefit of the business judgment of these experienced lumbermen. The directors caused a cruise to be made of the timber, which subsequently was shown to have been substantially correct. It does not appear that the price paid for the timber was high as the market then stood, nor that the circumstances surrounding the tract of timber were such as to make its successful operation impracticable under ordinary conditions. The directors appear to have misjudged the future condition of the lumber market, erred as to the expense involved in the operations, and were deceived, to some extent, as to the quality of the timber. Such errors are most common in the business world, even among the most prudent and cautious, and can usually be assigned as the secret of failure in the large majority of unsuccessful enterprises. But for an honest error of judgment the law has no punishment. When the amount of the original investment was exhausted, it was thought to be necessary and the conclusion was reached that it was better to make the further advancements than to run the risk of the loss of all that had previously been invested. And the testimony shows that by reason of the subsequent purchase of the Ephraim Creek property, which was made after a pretty careful examination, the ultimate loss was much less than it otherwise would have been.

It is not difficult to find in the light of after events that the judgment of the directors was greatly at fault. But under all the facts and circumstances of the case as they were when that judgment was called into exercise, I cannot convict the defendants of negligence in the execution of their trust.

[8] Referring to the third and fourth positions taken by the plaintiffs, these, as we have seen, are merged in the ones which we have discussed. In other words, taking the case in its strongest aspect against the directors, it is an investment of the funds of the bank in the Sewell Lumber Company, and as such can neither be a loan upon a mortgage nor an overloan, as the bank cannot loan to itself. With reference to the alleged overloan, the letter of the Comptroller of the Currency shows clearly that there has been no prohibition by that department against treating investments in bonds of a company as distinct from the loans to that company upon negotiable paper. It also appears that the examiner of the bank knew of these bonds and did not hesitate to pass them, as he was of the opinion and apparently still is, that the bonds of the company are not to be reckoned as a part of the indebtedness prohibited in the way of making an overloan. The president of the bank was regarded as an expert in the banking business, and with him the counsel of the bank, Mr. Stone, conferred upon the subject. It appears that Mr. Stone made an examination into the matter, and advised that the purchase of the bonds of the corporation was an investment, and not a loan within the prohibition of the act. In these circumstances, it would appear to be a harsh finding that

the directors knowingly violated this provision of the National Bank Act. In like manner, the charge that the directors loaned money upon a mortgage in violation of the banking act is disposed of if the matter was an investment, as in that case the bank could not be said to be lending money upon a mortgage. It has been held that to constitute a loan upon a mortgage, the mortgage must be the main security. If the loan is upon personal security, the fact that a mortgage is taken as incidental thereto is not prohibited by the act. It could hardly be that a bank might lawfully buy the unsecured bonds of a corporation, but if those bonds were secured by a mortgage, which made them doubly safe, the National Bank Act would be violated. In Union National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, the learned judge refers to Bank v. North, 4 Johns. Ch. (N. Y.) 370, in which case a Pennsylvania banking corporation had taken a mortgage upon real estate in New York, the charter not authorizing it to take a mortgage except to secure a debt previously contracted in the course of its dealings, and it was held that if the loan and mortgage were concurrent acts and intended so to be, it was not a case within the reason and spirit of the restraining clause of the statute, which only meant to prohibit the banking company from investing their capital in real property and engaging in land speculations. Under a fair interpretation of the act, it would not appear that it was violated in the manner charged, and, if so, it was certainly not knowingly and intentionally violated by the defendants.

[9] If in buying the bonds at 90 per cent. of their face was usurious, the liability for any particular violation of the banking act is "for all damages which the association, its shareholders or any person, shall have sustained-in consequence of such violation," and treating the transaction as a loan in which interest in excess of the rate allowed in Pennsylvania was charged, there is no evidence whatever that any damages were sustained thereby.

On a very painstaking consideration of the whole case, I am led to the conclusion that the bill should be dismissed, with costs. A decree may be drawn accordingly.