692 A.2d 1042

Albert CUKER and Sabina Cuker, and Stanley Katzman and Sidney J. Silver, Trustees for the Irrevocable Trust for the Descendants of Howard and Pearl Katzman, derivatively, on behalf of PECO Energy Company, Respondents,

v.

Albert G. MIKALAUSKAS, Joseph F. Paquette, Jr., Corbin A. McNeill, Jr., John H. Austin, Jr., James L. Everett, Richard G. Gilmore, Kenneth G. Lawrence, Morton W. Rimmerman, Thomas P. Hill, Jr., Raymond F. Holman and PECO Energy Company, Petitioners.

Supreme Court of Pennsylvania.

Argued Jan. 27, 1997.

Decided April 21, 1997.

Reargument Denied June 18, 1997.

Alan J. Davis, Carl G. Roberts, Martin C. Bryre, Jr., for Petitioners.

Brady L. Green, Amicus for Pa. Chamber of Bus.

David Berger, Donald B. Lewis, Jay S. Cohen, Stanley R. Wolfe, for Albert & Sabina Cuker.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

PECO Energy Company filed a motion for summary judgment seeking termination of minority shareholder derivative actions. When the motion was denied by the court of common pleas, PECO sought extraordinary relief in this court pursuant to Pa.R.A.P. 3309. We granted the petition, limited to the issue of "whether the 'business judgment rule' permits the board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders."

PECO is a publicly regulated utility incorporated in Pennsylvania which sells electricity and gas to residential, commercial, and industrial customers in Philadelphia and four surrounding counties. PECO is required to conform to PUC regulations which govern the provision of service to residential customers, including opening, billing, and terminating ac-

counts. PECO is required to report regularly to the PUC on a wide variety of statistical and performance information regarding its compliance with the regulations as interpreted by the PUC. Like other utilities, PECO is required to undergo a comprehensive management audit at the direction of the PUC approximately every ten years. The most recent audit was conducted by Ernst & Young. The report issued in 1991 recommended changes in twenty-two areas, including criticisms and recommendations regarding PECO's credit and collection function.

Two trustees, on behalf of a group of minority shareholders, made a demand on PECO, alleging wrongdoing by some PECO directors and officers. This Katzman demand, made in May, 1993, asserted that the delinquent officers had damaged PECO by mismanaging the credit and collection function, particularly as to the collection of overdue accounts. The shareholders demanded that PECO authorize litigation against the wrongdoers to recover monetary damages sustained by PECO. At its meeting of June 28, 1993, PECO's board responded by creating a special litigation committee to investigate the Katzman allegations.

Less than a month later, a second group of minority shareholders filed a complaint against PECO officers and directors. *Cuker v. Mikalauskas*, July Term, 1993, No. 3470 (C.P.Phila.). The *Cuker* complaint, filed in July, 1993, made the same allegations as those in the Katzman demand, with extensive references to the Ernst & Young audit report. The *Cuker* complaint was filed before the special litigation committee had begun its substantive work of investigating and evaluating the Katzman demand, so the committee's work encompassed both the Katzman and Cuker matters. Only the twelve nondefendant members of the PECO board acted to create the special committee, which consisted of three outside directors who had never been employed by PECO and who were not named in the Katzman demand or the *Cuker* complaint.

The work of the special committee was aided by the law firm of Dilworth, Paxson, Kalish & Kauffman, as well as PECO's regular outside auditor, Coopers & Lybrand, selected

to assist in accounting matters because Coopers was knowledgeable about the utility industry and was familiar with PECO's accounting practices. The special committee conducted an extensive investigation over many months while maintaining a separate existence from PECO and its board of directors and keeping its deliberations confidential. The special committee held its final meeting on January 26, 1994, whereupon it reached its conclusions and prepared its report.

The report of the special committee concluded that there was no evidence of bad faith, self-dealing, concealment, or other breaches of the duty of loyalty by any of the defendant officers. It also concluded that the defendant officers "exercised sound business judgment in managing the affairs of the company" and that their actions "were reasonably calculated to further the best interests of the company." The three-hundred-page report identified numerous factors underlying the conclusions of the special committee. Significant considerations included the utility's efforts before the PUC to raise electricity rates in consequence of the expense of new nuclear generating plants. Other factors were the impact of PUC regulations limiting wintertime termination of residential service and other limitations on the use of collection techniques such as terminations of overdue customers, particularly with a large population of poverty level users among PECO's customer base. These considerations were supported by PUC documents which criticized PECO for aggressive and excessive terminations in recent years. The report of the special litigation committee also described how PECO's management had been attentive to the credit and collection function, with constant efforts to improve performance in that area. According to the report, limiting the use of terminations as a collection technique was a sound business judgment, reducing antagonism between the PUC and PECO and resulting in rate increases which produced revenue far in excess of the losses attributed to nonaggressive collection tactics. The report concluded that proceeding with a derivative suit based largely on findings of the Ernst & Young audit would not be in the best interests of PECO.

When it received the report of the special litigation committee with appendices containing the documents and interviews underlying the report, the board debated the recommendations at two meetings early in 1994. The twelve nondefendant members of the PECO board voted unanimously on March 14, 1994 to reject the Katzman demand and to terminate the *Cuker* action.

In the *Cuker* action, the court of common pleas rejected PECO's motion for summary judgment. The court stated that "the 'business judgment rule' [has been] adopted in some states but never previously employed in Pennsylvania." The court held that as a matter of Pennsylvania public policy, a corporation lacks power to terminate pending derivative litigation. On PECO's motion, the court certified four controlling questions of law to the Superior Court, pursuant to 42 Pa.C.S. § 702(b), including the question presented in this appeal.[1] The Superior Court denied interlocutory review, on January 31, 1996, after the *Cuker* plaintiffs argued that unresolved factual issues precluded review.

When the PECO board, following the recommendation of the special litigation committee, rejected the Katzman demand, the Katzman claimants filed a shareholder derivative action. *Katzman v. Mikalauskas,* August Term 1995, No. 1278 (C.P.Phila.). After the Superior Court denied interlocu-

---

1. The questions certified by the court were:

(1) whether a court should terminate a derivative action brought by minority shareholders purportedly on behalf of a corporation where the non-defendant members of its board of directors have determined, after an adequate and independent investigation and in the exercise of sound business judgment, that the action is not in the best interests of the corporation;

(2) whether the decision of the Board in this case was protected by the business judgment rule the Board was independent and had conducted an adequate investigation in good faith through a qualified and unbiased Special Committee;

(3) whether the *Nanty–Glo* rule relating to motions for summary judgment should have been applied to defendants' motion seeking the termination of the derivative action; and

(4) whether the defendants are entitled to a pretrial evidentiary hearing in the event the Court finds there are factual questions surrounding the Board's decision to terminate the derivative action.

tory review of *Cuker*, the two cases were consolidated by the court of common pleas on February 20, 1996.

PECO then filed a petition to terminate the consolidated actions which raised issues of fact regarding the independence of the special committee and the adequacy of its investigation. The plaintiffs responded that the court of common pleas could not resolve the factual issues because of the earlier decision in the same court that a Pennsylvania corporation lacks the power to terminate pending derivative litigation. This decision presumably precluded another judge of the same court from hearing the factual disputes. The court denied PECO's petition to terminate on May 21, 1996.

The decisions of the Superior Court on January 31, 1996 and the court of common pleas on May 21, 1996 were irreconcilably inconsistent. The Superior Court refused to consider the legal questions regarding the business judgment rule because there were unresolved factual questions pertaining to the independence of the board and the adequacy of its investigation. The court of common pleas then refused to consider the same factual disputes due to its prior holding that the business judgment rule is not the law of Pennsylvania. Because of this inconsistency, PECO sought extraordinary relief in this court under our King's Bench powers, which we granted.

■ The issue is whether the business judgment rule permits the board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders. The business judgment rule insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation. 1 ALI, *Principles of Corporate Governance: Analysis and Recommendations*, (1994) (*"ALI Principles"*)

§ 4.01(c). The Delaware Supreme Court has written a widely quoted formulation of the rule:

It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) (citations omitted). The Ohio Supreme Court expressed the rule as follows: "The rule is a rebuttable presumption that directors are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted with good faith." *Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co.*, 26 Ohio St.3d 15, 20, 496 N.E.2d 959, 963–64 (1986).

Most American jurisdictions employ the business judgment rule, but there is no uniform expression of the rule. It is sometimes referred to as a doctrine. Regardless of the precise terminology, the doctrine serves several significant public policies. It encourages competent individuals to become directors by insulating them from liability for errors in judgment. *See, e.g., Briggs v. Spaulding*, 141 U.S. 132, 149, 11 S.Ct. 924, 929–30, 35 L.Ed. 662 (1891); *Weiss v. Temporary Investment Fund, Inc.*, 692 F.2d 928 (3d Cir.1982), *vacated on other grounds*, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984). The doctrine also recognizes that business decisions frequently entail some degree of risk and consequently provides directors broad discretion in setting policies without judicial or shareholder second-guessing. *See e.g., Cramer v. General Telephone & Electronics Corp.*, 582 F.2d 259, 274 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). Finally, the doctrine prevents courts from becoming enmeshed in complex corporate decision-making, a task they are ill-equipped to perform. *Weiss*, 692 F.2d at 941; *International Insurance Co. v. Johns*, 874 F.2d 1447, 1458 n.

20 (11th Cir.1989). These policies are reflected in the conclusions of the Connecticut Supreme Court in a decision formally adopting the business judgment rule:

"The business judgment doctrine [is] a rule of law that insulates business decisions from most forms of review. Courts recognize that managers have both better information and better incentives than they. The press of market forces ... will more effectively serve the interests of all participants than will an error-prone judicial process." The business judgment rule "expresses a sensible policy of judicial noninterference with business decisions made in circumstances free from serious conflicts of interest between management, which makes the decisions, and the corporation's shareholders. Not only do businessmen know more about business than judges do, but competition in the product and labor markets and in the market for corporate control provides sufficient punishment for businessmen who commit more than their share of business mistakes." "The fact is that liability is rarely imposed upon corporate directors or officers simply for bad judgment and this reluctance to impose liability for unsuccessful business decisions has been doctrinally labeled the business judgment rule." Shareholders challenging the wisdom of a business decision taken by management must overcome the business judgment rule. "For efficiency reasons, corporate decisionmakers should be permitted to act decisively and with relative freedom from a judge's or jury's subsequent second-guessing. It is desirable to encourage directors and officers to enter new markets, develop new products, innovate, and take other business risks." 1 A.L.I., Principles of Corporate Governance (1994) § 4.01(c) comment, p. 174.

*Rosenfield v. Metals Selling Corp.*, 229 Conn. 771, 786–88, 643 A.2d 1253, 1262 (1994) (citations and footnotes omitted). In summary, the business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-

guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance.

This has been the policy of Pennsylvania for over a century, as reflected in the decisions of this court as early as 1872. Ironically, this court has never used the term "business judgment rule" in a corporate context nor has it explicitly adopted the business judgment rule. Nevertheless, a review of Pennsylvania decisions establishes that the business judgment doctrine or rule is the law of Pennsylvania.

*Spering's Appeal,* 71 Pa. 11 (1872), involved a shareholder's suit against an insolvent corporation's directors for mismanagement. With no evidence of fraud or self-dealing, the court posed the issue as whether the directors of a corporation may be liable for mere mismanagement. Relying on cases as early as 1742, this court adopted the business judgment rule:

> ... [W]hile directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or wilful misconduct or breach of trust for their own benefit and not for the benefit of the stockholders ..., yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest and provided they are fairly within the scope of the powers and discretion confided to the managing body.

71 Pa. at 24. In 1875, this court reaffirmed the rule:

> From [*Spering's Appeal, supra,*] we learn that directors are mandatories only, and as such, held to but ordinary skill and diligence, and are not responsible to their fellow corporators for the want of judgment and knowledge. They are personally liable only where they are guilty of fraudulent conduct or of acts clearly *ultra vires.*

*Watts's Appeal,* 78 Pa. 370, 392 (1875). In *Swentzel v. Penn Bank,* 147 Pa. 140, 152, 23 A. 405, 415 (1892), this court stated that "directors, who are gratuitous mandatories, are only liable for fraud, or for such gross negligence as amounts to fraud...." In *Stone v. Schiller Building & Loan Ass'n,* 302 Pa. 544, 555, 153 A. 758, 761 (1931), we stated: "Officers or

directors of a corporation are not personally liable for honest mistakes in judgment when doing acts within their discretion, even though such mistakes show absence of reasonable care; they are liable only when they are grossly negligent or fraudulent." In a more recent case involving a derivative lawsuit, we stated:

> From an early date this Court has consistently and realistically recognized the danger of subjecting corporate directors to liability whenever any of the transactions of the company did not meet with success.
>
> "... [T]he assets of a business corporation are held in lighter grasp [than those of a trust]; shares of stock are taken with notice that the assets shall be employed in making a profit, and that *it is customary to take business risks*."

*Smith v. Brown–Borhek Co.*, 414 Pa. 325, 333, 200 A.2d 398, 401 (1964) (emphasis in original), quoting *Hunt v. Aufderheide*, 330 Pa. 362, 376–77, 199 A. 345 (1938). In another case we stated:

> [T]he directors of a business corporation are not insurers that their actions will result in pecuniary profit and they are, in the course of their duties, called upon to undertake certain calculated "business risks"; ... for errors in judgment, exercised in good faith, the directors of a corporation should not be penalized. ...

*Selheimer v. Manganese Corp.*, 423 Pa. 563, 581, 224 A.2d 634, 644 (1966). These cases, cumulatively, are both application and explanation of the business judgment rule.

Respondents argue correctly that passage of the Business Corporation Law in 1933 affected caselaw espousing business judgment principles prior to 1933. Passage of the Business Corporation Law of 1933, however, merely modified the circumstances in which directors might be held liable; it did not vitiate the principles behind the business judgment rule. In other words, although a statute may alter the threshold circumstances which preclude application of the business judgment rule, a court must apply the business judgment rule if

shareholders fail to prove those threshold circumstances. Stated differently, if a court makes a preliminary determination that a business decision was made under proper circumstances, however that concept is currently defined, then the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision. Whatever the effect of the Business Corporation Law of 1933, as amended, 15 P.S. § 1001 *et seq.* (repealed), the Business Corporation Law of 1988, 15 Pa.C.S. § 1101 *et seq.,* the Directors' Liability Act, 42 Pa.C.S. § 8361 *et seq.* (repealed), or the General Association Act Amendments Act, 15 Pa.C.S. § 511 *et seq.,* application of the appropriate statutory standard is a preliminary question which must be decided before the merits of the underlying decision may be litigated. In this case, therefore, unless respondents can establish improper conduct by PECO's board of directors (fraud, self-dealing, violation of statutory duties, etc.), the board's decisions regarding PECO's credit and collection function are beyond the scope of review of any court.

■ Decisions regarding litigation by or on behalf of a corporation, including shareholder derivative actions, are business decisions as much as any other financial decisions. As such, they are within the province of the board of directors. 15 Pa.C.S. § 1721. Such business decisions of a board of directors are, unless taken in violation of a common law or statutory duty, within the scope of the business judgment rule. It follows that the court of common pleas erred when it held that the business judgment rule is not the law of Pennsylvania, and the Superior Court erred when it denied review rather than correcting the trial court by ruling on the first question certified under 42 Pa.C.S. § 702(b), set forth in footnote one, supra.

The errors committed in both of the lower courts demonstrate that the practical effect of this holding needs elaboration. Assuming that an independent board of directors may terminate shareholder derivative actions, what is needed is a procedural mechanism for implementation and judicial review of the board's decision. Without considering the merits of the

action, a court should determine the validity of the board's decision to terminate the litigation; if that decision was made in accordance with the appropriate standards, then the court should dismiss the derivative action prior to litigation on the merits.

The business judgment rule should insulate officers and directors from judicial intervention in the absence of fraud or self-dealing, if challenged decisions were within the scope of the directors' authority, if they exercised reasonable diligence, and if they honestly and rationally believed their decisions were in the best interests of the company. It is obvious that a court must examine the circumstances surrounding the decisions in order to determine if the conditions warrant application of the business judgment rule. If they do, the court will never proceed to an examination of the merits of the challenged decisions, for that is precisely what the business judgment rule prohibits. In order to make the business judgment rule meaningful, the preliminary examination should be limited and precise so as to minimize judicial involvement when application of the business judgment rule is warranted.

To achieve these goals, a court might stay the derivative action while it determines the propriety of the board's decision. The court might order limited discovery or an evidentiary hearing to resolve issues respecting the board's decision. Factors bearing on the board's decision will include whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith). If all of these criteria are satisfied,[2] the business judgment rule applies and the court should dismiss the action.

2. It should be noted that respondents contest all of these criteria, representing that the special litigation committee was not disinterested or independent, counsel was not disinterested or independent, the investigation was inadequate, and that directors breached their fiduciary duties. Until factual determinations are made in regard to these

■ These considerations and procedures are all encompassed in Part VII, chapter 1 of the *ALI Principles* (relating to the derivative action), which provides a comprehensive mechanism to address shareholder derivative actions. A number of its provisions are implicated in the action at bar. Sections 7.02 (standing), 7.03 (the demand rule), 7.04 (procedure in derivative action), 7.05 (board authority in derivative action), 7.06 (judicial stay of derivative action), 7.07, 7.08, and 7.09 (dismissal of derivative action), 7.10 (standard of judicial review), and 7.13 (judicial procedures) are specifically applicable to this case.[3] These sections set forth guidance which is consistent with Pennsylvania law and precedent, which furthers the policies inherent in the business judgment rule, and which provides an appropriate degree of specificity to guide the trial court in controlling the proceedings in this litigation.

We specifically adopt §§ 7.02–7.10, and § 7.13 of the *ALI Principles*.[4,5] In doing so we have weighed many considerations. First, the opinion of the trial court, the questions certified to the Superior Court, and the inability of PECO to obtain a definitive ruling from the lower courts all demonstrate the need for specific guidance from this court on how

disputed issues, a trial court cannot conclude whether or not the business judgment rule requires dismissal of the action.

**3.** *ALI Principles* §§ 4.01, 4.02, and 4.03 (duties of directors and officers; the business judgment rule; reliance on committees and other persons) are similar but not identical to the statutory standards found in 15 Pa.C.S. §§ 512, 513, 515, 1712, 1713, and 1715. The statutory standards, of course, control the duties of directors and the application of the business judgment rule in Pennsylvania.

**4.** The full text of these sections is set forth in the appendix to this opinion.

**5.** Our adoption of these sections is not a rejection of other sections not cited. We have identified and studied the sections which apply to this case and have adopted those which appear most relevant.

The entire publication, all seven parts, is a comprehensive, cohesive work more than a decade in preparation. Additional sections of the publication, particularly procedural ones due to their interlocking character, may be adopted in the future. Issues in future cases or, perhaps, further proceedings in this case might implicate additional sections of the *ALI Principles*. Courts of the Commonwealth are free to consider other parts of the work and utilize them if they are helpful and appear to be consistent with Pennsylvania law.

such litigation should be managed; the ALI principles provide such guidance in specific terms which will simplify this litigation. Second, we have often found ALI guidance helpful in the past, most frequently in adopting or citing sections of various Restatements; the scholarship reflected in work of the American Law Institute has been consistently reliable and useful. Third, the principles set forth by the ALI are generally consistent with Pennsylvania precedent. Fourth, although the *ALI Principles* incorporate much of the law of New York and Delaware, other states with extensive corporate jurisprudence, the *ALI Principles* better serve the needs of Pennsylvania. Although New York law parallels Pennsylvania law in many respects, it does not set forth any procedures to govern the review of corporate decisions relating to derivative litigation, and this omission would fail to satisfy the needs evident in this case. Delaware law permits a court in some cases ("demand excused" cases) to apply its own business judgment in the review process when deciding to honor the directors' decision to terminate derivative litigation. In our view, this is a defect which could eviscerate the business judgment rule and contradict a long line of Pennsylvania precedents. Delaware law also fails to provide a procedural framework for judicial review of corporate decisions under the business judgment rule.

Accordingly, we adopt the specified sections of the *ALI Principles,* reverse the orders of the court of common pleas, and remand the matter for further proceedings consistent with this opinion.

Orders reversed and case remanded.

### APPENDIX

2 ALI, *Principles of Corporate Governance: Analysis and Recommendations* (1994):

§ 7.02 Standing to Commence and Maintain a Derivative Action

(a) A holder of an equity security has standing to commence and maintain a derivative action if the holder:

(1) Acquired the equity security either (A) before the material facts relating to the alleged wrong were publicly disclosed or were known by, or specifically communicated to, the holder, or (B) by devolution of law, directly or indirectly, from a prior holder who acquired the security as described in the preceding clause (A);

(2) Continues to hold the equity security until the time of judgment, unless the failure to do so is the result of corporate action in which the holder did not acquiesce, and either (A) the derivative action was commenced prior to the corporate action terminating the holder's status, or (B) the court finds that the holder is better able to represent the interests of the shareholders than any other holder who has brought suit;

(3) Has complied with the demand requirement of § 7.03 (Exhaustion of Intracorporate Remedies; The Demand Rule) or was excused by its terms; and

(4) Is able to represent fairly and adequately the interests of the shareholders.

(b) On a timely motion, a holder of an equity security should be permitted to intervene in a derivative action, unless the court finds that the interests to be represented by the intervenor are already fairly and adequately represented or that the intervenor is unable to represent fairly and adequately the interests of the shareholders.

(c) A director of a corporation has standing to commence and maintain a derivative action unless the court finds that the director is unable to represent fairly and adequately the interest of the shareholders.

§ 7.03 Exhaustion of Intracorporate Remedies: The Demand Rule

(a) Before commencing a derivative action, a holder or a director should be required to make a written demand upon the board of directors of the corporation, requesting it to prosecute the action or take suitable corrective measures, unless demand is excused under § 7.03(b). The demand should give notice to the board, with reasonable specificity,

of the essential facts relied upon to support each of the claims made therein.

(b) Demand on the board should be excused only if the plaintiff makes a specific showing that irreparable injury to the corporation would otherwise result, and in such instances demand should be made promptly after commencement of the action.

(c) Demand on shareholders should not be required.

(d) Except as provided in § 7.03(b), the court should dismiss a derivative action that is commenced prior to the response of the board or a committee thereof to the demand required by § 7.03(a), unless the board or committee fails to respond within a reasonable time.

§ 7.04 Pleading, Demand Rejection, Procedure, and Costs in a Derivative Action

The legal standards applicable to a derivative action should provide that:

(a) *Particularity; Demand Rejection.*

(1) *In General.* The complaint shall plead with particularity facts that, if true, raise a significant prospect that the transaction or conduct complained of did not meet the applicable requirements of Parts IV (Duty of Care and the Business Judgment Rule), V (Duty of Fair Dealing), or VI (Role of Directors and Shareholders in Transactions in Control and Tender Offers), in light of any approvals of the transaction or conduct communicated to the plaintiff by the corporation.

(2) *Demand Rejection.* If the corporation rejects the demand made on the board pursuant to § 7.03, and if, at or following the rejection, the corporation delivers to the plaintiff a written reply to the demand which states that the demand was rejected by directors who were not interested in the transaction or conduct described in and forming the basis for the demand and that those directors constituted a majority of the entire board and were capable as a group of objective judgment in the circumstances, and which provides specific reasons for those

statements, then the complaint shall also plead with particularity facts that, if true, raise a significant prospect that either:

    (A) The statements in the reply are not correct;

    (B) If Part IV, V, or VI provides that the underlying transaction or conduct would be reviewed under a standard other than the business judgment rule, either (i) that the disinterested directors who rejected the demand did not satisfy the good faith and informational requirements (§ 4.01(c)(2)) of the business judgment rule or (ii) that disinterested directors could not reasonably have determined that rejection of the demand was in the best interests of the corporation.

If the complaint fails to set forth sufficiently such particularized facts, defendants shall be entitled to dismissal of the complaint prior to discovery.

    (b) *Attorney's Certification.* Each party's attorney of record shall sign every pleading, motion, and other paper filed on behalf of the party, and such signature shall constitute the attorney's certification that (i) to the best of the attorney's knowledge, information, and belief, formed after reasonable inquiry, the pleading, motion, or other paper is well grounded in fact and is warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law, and (ii) the pleading, motion, or other paper is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

    (c) *Security for Expenses.* Except as authorized by statute or judicial rule applicable to civil actions generally, no bond, undertaking, or other security for expenses shall be required.

    (d) *Award of Costs.* The court may award applicable costs, including reasonable attorney's fees and expenses, against a party, or a party's counsel:

    (1) At any time, if the court finds that any specific claim for relief or defense was asserted or any pleading,

motion, request for discovery, or other action was made or taken in bad faith or without reasonable cause; or

(2) Upon final judgment, if the court finds, in light of all the evidence, and considering both the state and trend of the substantive law, that the action taken as a whole was brought, prosecuted, or defended in bad faith or in an unreasonable manner.

§ 7.05  Board of Committee Authority in Regard to a Derivative Action

(a) The board of a corporation in whose name or right a derivative action is brought has standing on behalf of the corporation to:

(1) Move to dismiss the action on account of the plaintiff's lack of standing under § 7.02 (Standing to Commence and Maintain a Derivative Action) or the plaintiff's failure to comply with § 7.03 (Exhaustion of Intracorporate Remedies: The Demand Rule) or § 7.04(a) or (b) (Pleading, Demand Rejection, Procedure, and Costs in a Derivative Action) or move for dismissal of the complaint or for summary judgment;

(2) Move for a stay of the action, including discovery, as provided by § 7.06 (Authority of Court to Stay a Derivative Action);

(3) Move to dismiss the action as contrary to the best interests of the corporation, as provided in §§ 7.07–7.12 (dismissal of a derivative action based on a motion requesting dismissal by the board, a board committee, the shareholders, or a special panel);

(4) Oppose injunctive or other relief materially affecting the corporation's interests;

(5) Adopt or pursue the action in the corporation's right;

(6) Comment on, object to, or recommend any proposed settlement, discontinuance, compromise, or voluntary dismissal by agreement between the plaintiff and any defendant under § 7.14 (Settlement of a Derivative Action by Agreement Between the Plaintiff and a Defendant), or

any award of attorney's fees and other expenses under § 7.17 (Plaintiff's attorney's Fees and Expenses); and

(7) Seek to settle the action without agreement of the plaintiff under § 7.15 (Settlement of a Derivative Action Without the Agreement of the Plaintiff).

Except as provided above, the corporation may not otherwise defend the action in the place of, or raise defenses on behalf of, other defendants.

(b) The board of a corporation in whose name or right a derivative action is brought may:

(1) Delegate its authority to take any action specified in § 7.05(a) to a committee of directors; or

(2) Request the court to appoint a special panel in lieu of a committee of directors, or a special member of a committee, under § 7.12 (Special Panel or Special Committee Members).

§ 7.06   Authority of Court to Stay a Derivative Action

In the absence of special circumstances, the court should stay discovery and all further proceedings by the plaintiff in a derivative action on the motion of the corporation and upon such conditions as the court deems appropriate pending the court's determination of any motion made by the corporation under § 7.04(a)(2) and the completion within a reasonable period of any review and evaluation undertaken and diligently pursued pursuant to § 7.09 (Procedures for Requesting Dismissal of a Derivative Action).   On the same basis the court may stay discovery and further proceedings pending (a) the resolution of a related action or (b) such other event or development as the interests of justice may require.

§ 7.07   Dismissal of a Derivative Action Based on a Motion Requesting Dismissal by the Board or a Committee:  General Statement

(a) The court having jurisdiction over a derivative action should dismiss the action as against one or more of the defendants based on a motion by the board or a properly

delegated committee requesting dismissal of the action as in the best interests of the corporation, if: .

(1) In the case of an action against a person other than a director, senior executive, or person in control of the corporation, or an associate of any such person, the determinations of the board or committee underlying the motion satisfy the requirements of the business judgment rule as specified in § 4.01;

(2) In the case of an action against a director, senior executive, or person in control of the corporation, or an associate of any such person, the conditions specified in § 7.08 (Dismissal of a Derivative Action Against Directors, Senior Executives, Controlling Persons, or Associates Based on a Motion Requesting Dismissal by the Board or a Committee) are satisfied; or

(3) In any case, the shareholders approve a resolution requesting dismissal of the action in the manner provided in § 7.11 (Dismissal of a Derivative Action Based Upon Action by the Shareholders).

(b) Regardless of whether a corporation chooses to proceed under § 7.08 or § 7.11, it is free to make any other motion available to it under the law, including a motion to dismiss the complaint or for summary judgment.

§ 7.08 Dismissal of a Derivative Action Against Directors, Senior Executives, Controlling Persons, or Associates Based on a Motion Requesting Dismissal by the Board or a Committee

The court should, subject to the provisions of § 7.10(b) (retention of significant improper benefit), dismiss a derivative action against a defendant who is a director, a senior executive, or a person in control of the corporation, or an associate of any such person, if:

(a) The board of directors or a properly delegated committee thereof (either in response to a demand or following commencement of the action) has determined that the action is contrary to the best interests of the corporation and has requested dismissal of the action;

(b) The procedures specified in § 7.09 (Procedures for Requesting Dismissal of a Derivative Action) for the conduct of a review and evaluation of the action were substantially complied with (either in response to a demand or following commencement of the action), or any material departures therefrom were justified under the circumstances; and

(c) The determinations of the board or committee satisfy the applicable standard of review set forth in § 7.10(a) (Standard of Judicial Review with Regard to a Board of Committee Motion Requesting Dismissal of a Derivative Action Under § 7.08).

§ 7.09   Procedures for Requesting Dismissal of a Derivative Action

(a) The following procedural standards should apply to the review and evaluation of a derivative action by the board or committee under § 7.08 (Dismissal of a Derivative Action Against Directors, Senior Executives, Controlling Persons, or Associates Based on a Motion Requesting Dismissal by the Board or a Committee) or § 7.11 (Dismissal of a Derivative Action Based Upon Action by the Shareholders):

(1) The board or a committee should be composed of two or more persons, no participating member of which was interested in the action, and should as a group be capable of objective judgment in the circumstances;

(2) The board or committee should be assisted by counsel of its choice and such other agents as it reasonably considers necessary;

(3) The determinations of the board or committee should be based upon a review and evaluation that was sufficiently informed to satisfy the standards applicable under § 7.10(a); and

(4) If the board or committee determines to request dismissal of the derivative action, it shall prepare and file with the court a report or other written submission setting forth its determinations in a manner sufficient to enable the court to conduct the review required under

§ 7.10 (Standard of Judicial Review with Regard to a Board or Committee Motion Requesting Dismissal of a Derivative Action Under § 7.08).

(b) If the court is unwilling to grant a motion to dismiss under § 7.08 or § 7.11 because the procedures followed by the board or committee departed materially from the standards specified in § 7.09(a), the court should permit the board or committee to supplement its procedures, and make such further reports or other written submissions, as will satisfy the standards specified in § 7.09(a), unless the court decides that (i) the board or committee did not act on the basis of a good faith belief that its procedures and report were justified in the circumstances; (ii) unreasonable delay or prejudice would result; or (iii) there is no reasonable prospect that such further steps would support dismissal of the action.

§ 7.10  Standard of Judicial Review with Regard to a Board or Committee Motion Requesting Dismissal of a Derivative Action Under § 7.08

(a) *Standard of Review.*  In deciding whether an action should be dismissed under § 7.08 (Dismissal of a Derivative Action Against Directors, Senior Executives, Controlling Persons, or Associates Based on a Motion Requesting Dismissal by the Board or a Committee), the court should apply the following standards of review:

(1) If the gravamen of the claim is that the defendant violated a duty set forth in Part IV (Duty of Care and the Business Judgment Rule), other than by committing a knowing and culpable violation of law that is alleged with particularity, or if the underlying transaction or conduct would be reviewed under the business judgment rule under § 5.03, § 5.04, § 5.05, § 5.06, § 5.08, or § 6.02, the court should dismiss the claim unless it finds that the board's or committee's determinations fail to satisfy the requirements of the business judgment rule as specified in § 4.01(c).

(2) In other cases governed by Part V (Duty of Fair Dealing) or Part VI (Role of Directors and Shareholders in Transactions in Control and Tender Offers), or to which the business judgment rule is not applicable, including cases in which the gravamen of the claim is that defendant committed a knowing and culpable violation of law in breach of Part IV, the court should dismiss the action if the court finds, in light of the applicable standards under Part IV, V, or VI that the board or committee was adequately informed under the circumstances and reasonably determined that dismissal was in the best interests of the corporation, based on grounds that the court deems to warrant reliance.

(3) In cases arising under either Subsection (a)(1) or (a)(2), the court may substantively review and determine any issue of law.

(b) *Retention of Significant Improper Benefit.* The court shall not dismiss an action if the plaintiff establishes that dismissal would permit a defendant, or an associate, to retain a significant improper benefit where:

(1) The defendant, either alone or collectively with others who are also found to have received a significant improper benefit arising out of the same transaction, possesses control of the corporation; or

(2) Such benefit was obtained:

(A) As the result of a knowing and material misrepresentation or omission or other fraudulent act; or

(B) Without advance authorization or the requisite ratification of such benefit by disinterested directors (or, in the case of a nondirector senior executive, advance authorization by a disinterested superior), or authorization or ratification by disinterested shareholders, and in breach of § 5.02 (Transactions with the Corporation) or § 5.04 (Use by a Director or Senior Executive of Corporate Property, Material Non–Public Corporate Information, or Corporate Position);

unless the court determines, in light of specific reasons advanced by the board or committee, that the likely injury to the corporation from continuation of the action convincingly outweighs any adverse impact on the public interest from dismissal of the action.

(c) *Subsequent Developments.* In determining whether the standards of § 7.10(a) are satisfied or whether § 7.10(b) or any of the exceptions set forth therein are applicable, the court may take into account considerations set forth by the board or committee (or otherwise brought to the court's attention) that reflect material developments subsequent to the time of the underlying transaction or conduct or to the time of the motion by the board or committee requesting dismissal.

§ 7.13 Judicial Procedures on Motions to Dismiss a Derivative Action Under § 7.08 or § 7.11

(a) *Filing of Report or Other Written Submission.* Upon a motion to dismiss an action under § 7.08 (Dismissal of a Derivative Action Against Directors, Senior Executives, Controlling Persons, or Associates Based on a Motion Requesting Dismissal by the Board or a Committee) or § 7.11 (Dismissal of a Derivative Action Based Upon Action by the Shareholders), the corporation shall file with the court a report or other written submission setting forth the procedures and determinations of the board or committee, or the resolution of the shareholders. A copy of the report or other written submission, including any supporting documentation filed by the corporation, shall be given to the plaintiff's counsel.

(b) *Protective Order.* The court may issue a protective order concerning such materials, where appropriate.

(c) *Discovery.* Subject to § 7.06 (Authority of Court to Stay a Derivative Action), if the plaintiff has demonstrated that a substantial issue exists whether the applicable standards of § 7.08, § 7.09, § 7.10, § 7.11, or § 7.12 have been satisfied and if the plaintiff is unable without undue hardship to obtain the information by other means, the court

may order such limited discovery or limited evidentiary hearing, as to issues specified by the court, as the court finds to be (i) necessary to enable it to render a decision on the motion under the applicable standards of § 7.08, § 7.09, § 7.10, § 7.11, or § 7.12, and (ii) consistent with an expedited resolution of the motion. In the absence of special circumstances, the court should limit on a similar basis any discovery that is sought by the plaintiff in response to a motion for summary judgment by the corporation or any defendant to those facts likely to be in dispute. The results of any such discovery may be made subject to a protective order on the same basis as under § 7.13(b).

(d) *Burdens of Proof.* The plaintiff has the burden of proof in the case of a motion (1) under § 7.08 where the standard of judicial review is determined under § 7.10(a)(1) because the basis of the claim involves a breach of a duty set forth in Part IV (Duty of Care and the Business Judgment Rule) or because the underlying transaction would be reviewed under the business judgment rule, or (2) under § 7.07(a)(1) (suits against third parties and lesser corporate officials). The corporation has the burden of proof in the case of a motion under § 7.08 where the standard of judicial review is determined under § 7.10(a)(2) because the underlying transaction would be reviewed under a standard other than the business judgment rule, except that the plaintiff retains the burden of proof in all cases to show (i) that a defendant's conduct involved a knowing and culpable violation of law, (ii) that the board or committee as a group was not capable of objective judgment in the circumstances as required by § 7.09(a)(a), and (iii) that dismissal of the action would permit a defendant or an associate thereof to retain a significant improper benefit under § 7.10(b). The corporation shall also have the burden of proving under § 7.10(b) that the likely injury to the corporation from continuation of the action convincingly outweighs any adverse impact on the public interest from dismissal of the action. In the case of a motion under § 7.11 (Dismissal of a Derivative Action Based Upon Action

by the Shareholders), the plaintiff has the burden of proof with respect to § 7.11(b), (c), and (d), and the corporation has the burden of proof with respect to § 7.11(a).

(e) *Privilege.* The plaintiff's counsel should be furnished a copy of related legal opinions received by the board or committee if any opinion is tendered to the court under § 7.13(a). Subject to that requirement, communications, both oral and written, between the board or committee and its counsel with respect to the subject matter of the action do not forfeit their privileged character, and documents, memoranda, or other material qualifying as attorney's work product do not become subject to discovery, on the grounds that the action is derivative or that the privilege was waived by the production to the plaintiff or the filing with the court of a report, other written submission, or supporting documents pursuant to § 7.13.